# HILL *v.* CALIFORNIA

No. 51.   Argued January 19, 1970—Reargued October 21, 1970—
Decided April 5, 1971

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, and BLACKMUN, JJ., joined. BLACK, J., concurred in the result. HARLAN, J., filed a concurring and dissenting opinion, in which MARSHALL, J., joined, *post*, p. 806. DOUGLAS, J., took no part in the consideration or decision of this case.

*Joseph Amato,* appointed by the Court, 396 U. S. 999, reargued the cause for petitioner.

*Ronald M. George,* Deputy Attorney General of California, reargued the cause for respondent. With him on the brief were *Thomas C. Lynch,* Attorney General, and *William E. James,* Assistant Attorney General.

*Keith C. Monroe* filed a brief for the Orange County Criminal Courts Bar Association et al. as *amici curiae* urging reversal. *Duke W. Dunbar,* Attorney General, *pro se,* and *John P. Moore,* Deputy Attorney General, filed a brief for the Attorney General of Colorado et al. as *amici curiae.*

MR. JUSTICE WHITE delivered the opinion of the Court.

On June 4, 1966, four armed men robbed a residence in Studio City, California. On June 5, Alfred Baum and Richard Bader were arrested for possession of narcotics; at the time of their arrest, they were driving petitioner Hill's car, and a search of the car produced property stolen in the Studio City robbery the day before. Bader and Baum both admitted taking part in the June 4 robbery, and both implicated Hill. Bader told the police that he was sharing an apartment with Hill at 9311

Sepulveda Boulevard. He also stated that the guns used in the robbery and other stolen property were in the apartment. On June 6, Baum and Bader again told the police that Hill had been involved in the June 4 robbery.

One of the investigating officers then checked official records on Hill, verifying his prior association with Bader, his age and physical description, his address, and the make of his car. The information the officer uncovered corresponded with the general descriptions by the robbery victims and the statements made by Baum and Bader.

Hill concedes that this information gave the police probable cause to arrest him, and the police undertook to do so on June 6. Four officers went to the Sepulveda Boulevard apartment, verified the address, and knocked. One of the officers testified: "The door was opened and a person who fit the description exactly of Archie Hill, as I had received it from both the cards and from Baum and Bader, answered the door. . . . We placed him under arrest for robbery."

The police had neither an arrest nor a search warrant. After arresting the man who answered the door, they asked him whether he was Hill and where the guns and stolen goods were. The arrestee replied that he was not Hill, that his name was Miller, that it was Hill's apartment and that he was waiting for Hill. He also claimed that he knew nothing about any stolen property or guns, although the police testified that an automatic pistol and a clip of ammunition were lying in plain view on a coffee table in the living room where the arrest took place. The arrestee then produced identification indicating that he was in fact Miller, but the police were unimpressed and proceeded to search the apartment— living room, bedroom, kitchen area, and bath—for a period which one officer described as "a couple of hours."

During the course of the search, the police seized sev-

eral items: rent receipts and personal correspondence bearing Hill's name from a dresser drawer in the bedroom; a starter pistol, two switchblade knives, a camera and case stolen in the Studio City robbery, and two hoodmasks made from white T-shirts, all from the bedroom; a .22-caliber revolver from under the living room sofa; and two pages of petitioner Hill's diary from a bedroom dresser drawer.[1]

---

[1] All of these items, except the rent receipts and correspondence, were later introduced in evidence at the preliminary examination involving Baum, Bader, and Hill. A radio stolen in the Studio City robbery was also introduced, since it was found in Hill's car when Baum and Bader were arrested. Finally, the State introduced two handwriting exemplars executed by petitioner Hill after his arrest. Although the rent receipts and personal correspondence were not introduced in evidence, one of the officers who participated in the arrest and search at the Hill apartment testified that in the same drawer where he found the diary pages "there were rent receipts, numerous stack of rent receipts at this particular apartment, made out to Archie Hill, and there were several other pieces of paper, correspondence, notes from girls, and so forth, all to an Archie or an Archie Hill." No objection was offered to this testimony.

Thereafter, petitioner's case was severed from that of Baum and Bader. Hill waived a jury and submitted the case for trial on the transcript of the preliminary hearing and the exhibits there introduced. The State called one additional witness at trial—Officer Gastaldo—who gave a more complete version of the investigation of the robbery and of the arrest of the man who turned out to be Miller. The two diary pages seized in Hill's apartment contained what was in effect a full confession of his participation in the Studio City robbery. The additional testimony of Officer Gastaldo was critical in establishing the legality of the arrest and subsequent search. After hearing this testimony, the trial judge denied petitioner's motion to suppress the items seized, including, of course, the diary pages. Hill presented no further evidence at trial, and was found guilty as charged. A motion for a new trial was subsequently denied, and petitioner's appeals in the California courts followed.

In his brief in this Court, petitioner attacks the admission of the diary pages on a ground never advanced below. For the reasons expressed in Part III of this opinion, we do not rule upon these contentions.

On October 20, 1966, Hill was found guilty of robbery on the basis of evidence produced at the preliminary hearing and the trial.[2] Eyewitnesses to the robbery were unable to identify Hill; the only substantial evidence of his guilt consisted of the items seized in the search of his apartment. In sustaining the admissibility of the evidence, the trial judge ruled that the arresting officers had acted in the good-faith belief that Miller was in fact Hill.[3] The District Court of Appeal agreed that the officers acted in good faith and that the arrest of Miller was valid but nonetheless thought the incident search of Hill's apartment unreasonable under the Fourth Amendment. 67 Cal. Rptr. 389 (1968).[4] The California Supreme Court in turn reversed, sustaining both the arrest and the search. 69 Cal. 2d 550, 446 P. 2d 521 (1968). We granted certiorari, 396 U. S. 818 (1969), and now affirm the judgment of the California Supreme Court.

---

[2] See n. 1, *supra*.

[3] The trial judge stated:

"I have fully reviewed the evidence. I have determined that the officer in good faith believed that the defendant, or that the person who was arrested—not the defendant in this case—was believed by the officer in good faith to be Mr. Hill, and that whether or not this document consisting of two pages of the private diary of Mr. Hill should be admitted depends on whether or not at the time of the arrest and the search of the premises, the officer acted in good faith."

[4] Justice Ford stated:

"While the doctrine of probable cause assures a balance between the rights of the individual and those of the government with respect to the matter of arrest, the constitutional protection against unreasonable searches, particularly of a person's home, would be less than complete if a plenary search could be justified as incident to an arrest of a person mistakenly believed by an officer to be in immediate charge of the premises. Such a case is not one where the right of privacy must reasonably yield to the right of search." 67 Cal. Rptr., at 391.

I

Petitioner argues that *Chimel* v. *California,* 395 U. S. 752 (1969), decided after his conviction was affirmed by the California Supreme Court, should be applied to his case, which is before us on direct review. *Chimel* narrowed the permissible scope of searches incident to arrest, but in *Williams* v. *United States* and *Elkanich* v. *United States, ante,* p. 646, we held *Chimel* inapplicable to searches occurring before the date of decision in that case—regardless of whether a case was still on direct review when *Chimel* was decided, see *Williams, supra,* or whether a *Chimel* challenge was asserted in a subsequent collateral attack on a conviction. See *Elkanich, supra.* We also stated that in light of past decisions there was no difference in constitutional terms between state and federal prisoners insofar as retroactive application to their cases of a new interpretation of the Bill of Rights is concerned. *Ante,* at 656. The search of Hill's apartment, permissible in scope under pre-*Chimel* standards, will not be retrospectively invalidated because of that decision.

II

Based on our own examination of the record, we find no reason to disturb either the findings of the California courts that the police had probable cause to arrest Hill and that the arresting officers had a reasonable, good-faith belief that the arrestee Miller was in fact Hill, or the conclusion that "[w]hen the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest." 69 Cal. 2d, at 553, 446 P. 2d, at 523.[5] The police unquestionably had probable

---

[5] The California Supreme Court relied on *People* v. *Kitchens,* 46 Cal. 2d 260, 263–264, 294 P. 2d 17, 19–20 (1956); *People* v. *Miller,* 193 Cal. App. 2d 838, 14 Cal. Rptr. 704 (1961), and *People* v.

cause to arrest Hill; they also had his address and a verified description. The mailbox at the indicated address listed Hill as the occupant of the apartment. Upon gaining entry to the apartment, they were confronted with one who fit the description of Hill received from various sources.[6] That person claimed he was Miller, not Hill. But aliases and false identifications are not uncommon.[7] Moreover, there was a lock on the door and Miller's explanation for his mode of entry was not convincing.[8] He also denied knowledge of firearms in the apartment although a pistol and loaded ammunition clip were in plain view in the room.[9] The upshot was that the offi-

---

*Campos,* 184 Cal. App. 2d 489, 7 Cal. Rptr. 513 (1960). See also *People* v. *Lopez,* 269 Cal. App. 2d 461, 468 n. 2, 74 Cal. Rptr. 740, 744 n. 2 (1969) (dictum).

[6] At the preliminary hearing and trial, the only disparities in description established were that Miller was two inches taller and 10 pounds heavier than Hill.

[7] In denying the motion to suppress, the trial judge took judicial notice of the fact "that those who are apprehended and are arrested many times attempt to avoid arrest by giving false identification."

[8] Petitioner points out that the officers had no idea how Miller gained access to the Hill apartment, and asserts that it was improper for them to assume that he was lawfully there. It is undisputed that Miller was the only occupant of the apartment. One of the officers testified that there was a lock on the door and that he had asked Miller how he had gotten into the apartment; Miller made no specific reply, except to reiterate that he had come in and was waiting for Hill, the tenant.

[9] Petitioner also claims that it was unreasonable for the officers to disregard Miller's proffered identification. However, Miller's answer to the question about firearms could reasonably be regarded as evasive, and his subsequent production of identification as therefore entitled to little weight. Petitioner stresses that Miller was subsequently booked in his own name when taken to the station house, arguing that this demonstrates that the officers' belief that Miller was Hill was unreasonable. However, the trial judge found that the arresting officer was not responsible for the booking pro-

cers in good faith believed Miller was Hill and arrested him. They were quite wrong as it turned out, and subjective good-faith belief would not in itself justify either the arrest or the subsequent search. But sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment and on the record before us the officers' mistake was understandable and the arrest a reasonable response to the situation facing them at the time.

Nor can we agree with petitioner that however valid the arrest of Miller, the subsequent search violated the Fourth Amendment. It is true that Miller was not Hill; nor did Miller have authority or control over the premises, although at the very least he was Hill's guest. But the question is not what evidence would have been admissible against Hill (or against Miller for that matter) if the police, with probable cause to arrest Miller, had arrested him in Hill's apartment and then carried out the search at issue. Here there was probable cause to arrest Hill and the police arrested Miller in Hill's apartment, reasonably believing him to be Hill. In these circumstances the police were entitled to do what the law would have allowed them to do if Miller had in fact been Hill, that is, to search incident to arrest and to seize evidence of the crime the police had probable cause to believe Hill had committed. When judged in accordance with "the factual and practical considerations of everyday life on which reasonable and prudent men, not

___

cedures under which Miller would be booked under whatever name he gave at the station house. This conclusion is buttressed by the fact that Miller was not released from custody for a day and a half, after a thorough check of his identification revealed that he had in fact told the truth about his identity, despite his evasiveness in dealing with the officers at the apartment.

legal technicians, act," *Brinegar* v. *United States,* 338 U. S. 160, 175 (1949), the arrest and subsequent search were reasonable and valid under the Fourth Amendment.

## III

Finally, in his brief in this Court, petitioner argues that the admission in evidence of the two pages of his diary—pages which contained what amounted to a confession of the robbery—violated the Fifth Amendment under *Boyd* v. *United States,* 116 U. S. 616 (1886). Counsel for Hill conceded at oral argument that the Fifth Amendment issue was not raised at trial. Nor was the issue raised, briefed, or argued in the California appellate courts.[10] The petition for certiorari likewise ignored it. In this posture of the case, the question, although briefed and argued here, is not properly before us. In *Cardinale* v. *Louisiana,* 394 U. S. 437 (1969), certiorari was granted to consider the constitutionality of a Louisiana statute, but at oral argument it developed that the federal question had never been raised, preserved, or passed upon in the state courts. Relying on a long line of cases, we dismissed the writ for want of jurisdiction. 394 U. S., at 439. In addition, we stated that there were sound policy reasons for adhering to such a rule. In the context of that case, we indicated the desirability of allowing state courts to pass first on the constitutionality of state statutes in light of a federal constitutional challenge; this assures both an adequate record and that the States have first opportunity to provide a definitive interpretation of their statutes. We also indicated that a federal habeas corpus remedy might remain if no state procedure for raising the issue was available following dismissal of the writ. These considerations are no less applicable in this

[10] Tr. of Oral Rearg. 34–35.

case. We therefore do not reach the Fifth Amendment question and affirm the judgment of the Supreme Court of California.

*It is so ordered.*

MR. JUSTICE BLACK concurs in the result.

MR. JUSTICE DOUGLAS took no part in the consideration or the decision of this case.

MR. JUSTICE HARLAN, whom MR. JUSTICE MARSHALL joins, concurring in part and dissenting in part.

I agree with the Court's opinion except for its conclusion that the *Chimel* case is not to be applied to this one.

Two Terms ago, in *Chimel* v. *California,* 395 U. S. 752 (1969), we held that a search without a warrant, but incident to a lawful arrest, must be narrowly confined in scope if it is to pass constitutional muster. In such circumstances, we said:

> "There is ample justification . . . for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.
>
> "There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. The 'adherence to judicial processes' mandated by the Fourth Amendment requires no less." 395 U. S., at 763 (footnote omitted).

The search here involved, fully described in the Court's opinion, plainly exceeded the bounds set forth in *Chimel*. The State contends that the search here was consistent with *Chimel* because conducted in the evening when it was not possible to obtain a search warrant. Whatever validity such a limiting principle might have in other contexts, it certainly cannot properly be invoked here. Baum and Bader had implicated Hill at least 24 hours prior to the search of Hill's apartment. Moreover, the State does not explain why it would not have been possible to observe the apartment after the mistaken arrest of Miller as Hill and then test before a magistrate the validity of their belief that they had probable cause for the issuance of a warrant authorizing a complete search of the apartment.

Because I believe this case reveals an obvious violation of *Chimel* and because I consider we are duty bound to apply the principles there enunciated to cases, like this one, before us on direct review, see my separate opinion in *Mackey* v. *United States* (and companion cases), *ante,* p. 675, decided today, I am compelled to cast my vote for reversal of the judgment of the Supreme Court of California.