[Nos. 740-2; 742-2. Division Two. December 28, 1973.]

THE STATE OF WASHINGTON, *Respondent,* v. TROY L. COBURNE
*et al., Appellants.*

*James Munro, Leonard W. Kruse,* and *L. R. Rick Smith,* for appellants (appointed counsel for appeal).

*John C. Merkel, Prosecuting Attorney,* and *Stephen E. Alexander, Deputy,* for respondent.

PETRIE, J.—Shortly after 7:30 p.m. on September 23, 1971, two men, one armed with and brandishing a handgun, appeared at the cashier's window of the Merit-Mart Store in Bremerton, Washington. One of the men announced to the two cashiers on duty, "This is a hold-up" and the other thrust a grocery sack across the counter. One of the men declared, "Put the big stuff in it or you're dead." The cashiers placed money in excess of $7,000 in the sack and passed it to the two men, who then departed. Outside the store, in the parking lot, as the two men were departing, one of them shot at and mortally wounded a security guard who was attempting to halt their flight.

Within 6 hours, the two defendants, Charles and Troy Coburne, were arrested in Seattle, Washington, and cur-

rency in excess of $7,000 and several items of incriminating evidence were seized by the arresting officers. By separate multiple-count informations, the two defendants were each charged with one count of first-degree murder, two counts of robbery and two counts of first-degree assault. The causes were consolidated for trial and a jury found each defendant guilty on all five counts. Their appeals to this court raise several alleged errors of the trial court: (1) failure to suppress the in-court identification testimony of the several eyewitnesses; (2) failure to suppress the evidence seized at the time of arrest; (3) failure to grant separate trials for each defendant; (4) failure to grant a motion for mistrial as a result of several alleged errors which occurred during trial; and (5) failure to grant a motion for new trial because of the cumulative effect of all the errors. For purposes of clarity, we consider each major issue, together with the necessary factual background, under separate headings.

### IDENTIFICATION PROCEDURES

At trial, four witnesses identified one or the other of the Coburne brothers as a participant in the events of September 23, 1971, in and around the Merit-Mart. Several hours after the robbery, three of the witnesses participated in a photo-identification procedure; all four participated in a corporeal lineup a week later. The defendants contend that the pretrial identification procedures were so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. Further, the defendants contend that the irregularities encountered in the several phases of pretrial identification effectively denied them a meaningful opportunity to cross-examine the witnesses. Accordingly, the defendants seek to have the court impose a major sanction—exclusion of the in-court identification.

Resolution of the issues requires that we review separately the two phases of pretrial identification: (1) the photo-identification procedures conducted on the night the crimes were committed; and (2) the corporeal lineup pro-

ceedings which took place a week later, together with the factual situations which preceded each of these events.

At the pretrial hearing conducted to resolve the issues raised by the defendants' motion to suppress the in-court identification, one of the cashiers at the Merit-Mart, Margaret Brueckner, testified that she participated in an attempt to construct a composite picture of the men who robbed and assaulted her; that she later was shown a series of six photographs, none of which she could recognize as one of the men involved in these crimes; that after attempting to put the composite together, "I was so confused I couldn't have recognized anyone."

The other cashier, Colleen Mundt, apparently through inadvertence, was first shown one snapshot, which she recognized as the man with the gun. Thereafter, she was shown a series of six mug shots in which she again recognized the man with the gun. Asked to explain what the officer said to her when he showed her the single snapshot, she replied, "He said 'Does this look like anybody you know' and I said 'Yes, it was the man that robbed me.' " She described the man with the gun as about 5 feet 9 or 10 inches, about 180 to 190 pounds, round face, unshaven, dark hair, dark eyes. She described the other man as taller, about 5 feet, 11 inches, thin, dark hair, about 160 pounds, and having long sideburns.

At the pretrial hearing Mrs. Mundt pointed to Charles Coburne as the man with the gun. She also remembered him as the person who had come to her cashier's window 2 nights prior to the robbery "to cash a money order made out in his wife's name." At that time he stood outside the window for about 20 or 30 minutes, at least part of the time talking to her, until his wife came in to sign the money order. The payee on the money order was Gladys Coburne, the name of Charles' wife.

Another identifying witness, Judy Heyn Burau, was a customer at the drug department of the Merit-Mart on the evening of September 23, 1971. As she was preparing to leave the store she noticed a person, whom she identified at

the pretrial hearing as Charles Coburne. She testified that he was "sort of grinning and he was almost running" and when she reached the drug department check-out stand, he "brushed right past me." She turned to walk out the front door and then she saw the security guard running toward and past her. She went outside, "heard a funny sort of thud . . . and then people started running in yelling that the security guard had been shot."

When Mrs. Burau went to the police station, she also attempted to make up a composite picture. She looked through a "book" of 15 to 20 pictures but could not recognize anyone. She apparently was not shown a series of six mug shots. After she could not recognize anyone out of the "book," she was shown two snapshots. She testified that the officer who gave the snapshots to her said, "How about these? Do these look familiar?" She described her response to the snapshots as:

> Well, they showed me the one that didn't ring a bell first. And it had a vague resemblance, but it wasn't the one. And then they handed me the other one, with no word at all, just handed me the other one. And I said definitely that was it.

The six mug shots, which were shown to Mrs. Brueckner and Mrs. Mundt, were numbered from one to six. Two of the shots were of Charles and Troy Coburne, but the other four shots were not available at the pretrial hearing. The snapshot, which Mrs. Mundt and Mrs. Burau identified, was removed from the glove compartment of an unoccupied car on September 23, 1971, after the robbery.[1] The police attempted to keep the six mug shots intact but neither the pictures nor their identifying numbers were available at the pretrial hearing. The police sergeant who assembled the series described how he selected the six mug shots: "I

---

[1]Precisely how the police acquired this snapshot is not clear from the record. We accept the trial court's determination, but do not independently decide, that the snapshot was unlawfully seized. *See,* however: *State v. Gibson,* 76 Wn.2d 814, 459 P.2d 22 (1969); *State v. Woods,* 3 Wn. App. 420, 475 P.2d 573 (1970).

picked the two suspects and I just picked up four others that would be similar in age and in that area, so they wouldn't be too farfetched."

■ Prior to evaluating the totality of circumstances in the case at bench, we should note that this is not a so-called "pure" identification case. Other evidence, totally aside from the eyewitness testimony, supports the jury's verdict. We note also that the defendants were not deprived of any constitutional right, federal or state, by reason of the fact that no counsel represented them at the photo-identification confrontation. *United States v. Ash*, 413 U.S. 300, 37 L. Ed. 2d 619, 93 S. Ct. 2568 (1973); *State v. Cerny*, 78 Wn.2d 845, 480 P.2d 199 (1971). Nevertheless, this jurisdiction does follow the standard suggested by *Simmons v. United States*, 390 U.S. 377, 19 L. Ed. 2d 1247, 88 S. Ct. 967 (1968), that:

> convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

*State v. Cerny, supra* at 853.

We are constrained to note also that the photo identification procedures employed by the police in this case, and the subsequent failure to preserve the identity of the six mug shots, were certainly not models of police activity designed to demonstrate to a court that the procedures were not impermissibly suggestive. We have previously expressed dissatisfaction with imprecise police practices when photo lineups are utilized. *State v. Ferguson*, 3 Wn. App. 898, 479 P.2d 114 (1970); *State v. Newman*, 4 Wn. App. 588, 484 P.2d 473 (1971). Indeed, we have not hesitated to reverse a conviction and impose the major sanction when the totality of the circumstances surrounding the photo-identification procedure was so impermissibly suggestive as to undermine the reliability of the eyewitness identification. *State v. Clark*, 2 Wn. App. 45, 467 P.2d 369 (1970).

■ When a motion to suppress an in-court identification is presented to the trial court, its analysis of the evidence adduced at the pretrial hearing must focus on whether or not impermissibly suggestive procedures were utilized. More precisely, the trial court must ascertain whether any external suggestiveness, intentional or inadvertent, subtly or obtusely applied, produced the initial identification—or whether the initial identification was truly produced by the independent exercise of the witness' own powers of perception, memory and reasoning. Appellate review, hampered by the cold record, must nonetheless focus on the same issue.

Accordingly, it is not significant that one of the pictures used by the police was unlawfully seized from an unoccupied vehicle. There was no challenge to its authenticity as a pictorial representation of Charles Coburne. The unlawfully seized snapshot was not presented at trial and no new evidence was obtained from its use on September 23, 1971. By the time Mrs. Mundt and Mrs. Burau identified Charles Coburne from the snapshot, the police already had independently obtained information to support a probable cause belief that Charles had participated in the robbery/murder.

It is significant, but not fatal to the prosecution, that one witness was initially shown a single photograph and another witness, after having failed to identify anyone in a "book" was thereafter shown only two pictures. *State v. Kearney,* 75 Wn.2d 168, 449 P.2d 400 (1969); *State v. Gefeller,* 76 Wn.2d 449, 458 P.2d 17 (1969). Furthermore, while it is distressing that the series of six mug shots could not be produced at the hearing, we note that the pictures used in *Simmons v. United States, supra,* also could not be identified at trial. Nevertheless, the court in *Simmons* permitted the identification to stand. While the inability to produce the series of mug shots undoubtedly hampered cross-examination, there was ample opportunity to cross-examine all the police and all the witnesses who participated in the photo-identification process. Two witnesses quite firmly identified Charles Coburne, none identified

Troy Coburne. Mrs. Mundt was not dependent solely upon her view of Charles Coburne during the violent robbery/assault encounter. She recalled having seen him on a prior, nonviolent occasion. Subsequently she remembered that the occasion was for a protracted period 2 nights prior to the robbery. We believe that the totality of the circumstances amply supports the trial court's determination that the photo-identification procedures were not so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

The defendants contend that the state has the burden of establishing by clear and convincing evidence that the in-court identification is independent of any suggestive procedures. That is not the measure of the state's burden. The defendants misinterpret certain language which appears in *United States v. Wade*, 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926 (1967). In *Wade*, the court determined that a postindictment corporeal lineup, conducted after Wade was in custody and after counsel had been appointed for him, was a critical stage of the litigation requiring presence of his counsel. Notwithstanding the *absence* of counsel at the lineup, the *Wade* court held that exclusion of the in-court identification would not be justified

> without first giving the Government the opportunity to establish by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification.

*United States v. Wade, supra* at 240.

We have already noted that the photo-identification confrontation is not a critical stage of the litigation. Hence, the measure of the state's burden as set forth in *Wade* is totally inapplicable to the case at bench at this stage of the proceedings.

We move then to consideration of the corporeal lineup which occurred on September 30, 1971. At that lineup, each defendant's court-appointed counsel *was* present. Each suggested certain changes in the lineup process, all of which were granted. Actually there were two successive lineups.

Charles and four other men were presented in the first lineup; Troy and four others were presented in the second. The identity of the eight stand-ins has been preserved in the record, but we have no pictorial recording of the actual lineups. Defendants do not, however, challenge the composition of the lineups.

The defendants' challenge to the lineup process lies in the fact that some time between the date of arrest and the date of the lineup, the Bremerton Sun, a daily newspaper in Bremerton, ran a front page story, together with a picture of the two Coburne brothers, presumably narrating the events known to the press up to that time. Neither the article nor the picture has been made a part of the record. We have not even been advised of the publication date of that article and picture. Accordingly, our ability to accurately evaluate the effect, if any, which that picture had toward undermining the reliability of the eyewitness testimony, is greatly diminished. We know only that the four in-court eyewitnesses did see the picture in the Bremerton Sun and all four participated in the lineup which followed some time thereafter.

All four eyewitnesses asserted that their view of the newspaper article and picture had no effect upon their ability to recognize the Coburne brothers in the lineup. At the lineup, Mrs. Mundt and Mrs. Burau again identified Charles Coburne. In addition, Mrs. Mundt selected Troy Coburne in his lineup but declared that she was "not positive" of her identification of Troy. Mrs. Brueckner, despite her inability to select a mug shot of Troy on the night of the robbery, did select Troy Coburne in his lineup as the person who had thrust a paper sack at her a week earlier, on September 23, 1971. At the pretrial hearing, she insisted, "I remember him from the robbery only." In-person identification is understandably more facile than identification through a relatively "dated" police photograph.

The fourth in-court eyewitness, Richard Nagley, observed the shooting episode in the parking lot. Just after he parked and locked his pickup truck, which incidentally

rides higher than normal because of oversize tires, he heard two shots. He saw two men, 30 feet apart, one in a uniform and one not in a uniform, and "they both had their arms outstretched with guns." He judged that the man without a uniform was about 100 feet from him. At the pretrial hearing he identified that man as Charles Coburne. He returned to his truck and shortly thereafter saw a vehicle with its lights on "pulling out." Two men were in it. He thought the man, whom he had seen with the gun, was the passenger in that vehicle. He described the vehicle as a late model, General Motors automobile, reddish color. Asked what the license number was, he replied, "I thought it was KT, and then I didn't get the last letter, but the numbers were 221."[2] He gave the police a description of the man with the gun and also advised them of the description and partial license number of the vehicle which pulled out of the parking lot after the shooting took place. He did not participate in the photo-identification procedure at the police station, but he did identify Charles Coburne at the lineup as the man he had seen a week previously in the parking lot.

 The publication of the newspaper picture is considered an "unarranged" photo showup. Conceivably, viewing it could have implanted a suggestion to the four eyewitnesses. Similarly, the photo-identification process, which also preceded the corporeal lineup, could have implanted suggestions into the minds of the three eyewitnesses who participated in both procedures. The trial court determined, however, that the totality of the circumstances surrounding and preceding the lineups was not so suggestive and conducive to misidentification as to amount to a denial of due process of law. We agree. Possible inferences of opportunities for misidentification do not amount to substantial likelihood of irreparable misidentification. *State v. Lane*, 4 Wn. App. 745, 484 P.2d 432 (1971).

Again, however, the defendants contend that the state

[2]The police broadcast sought a vehicle with a license number identified as KTW 221. There is no explanation in the record of the slight discrepancy.

must establish by clear and convincing evidence that the in-court identification was independent of the prejudicial viewing of the defendants' 'pictures in the newspaper. Again, the defendants misinterpret certain language in *United States v. Wade, supra,* which applies only in the absence of counsel from the lineup. Counsel were present and actively participated in the proceedings.

We find no reason to exclude any of the in-court evidence of the eyewitnesses who identified the defendants, and which was subsequently presented to the jury. We move, therefore, to the defendants' next major contention.

### SUPPRESSION OF EVIDENCE

Having obtained a partial description of the getaway car from eyewitness Nagley, the Bremerton police instituted procedures to locate a vehicle fitting the description. In about an hour an unoccupied 1971 Buick Skylark, cinnamon color, license KWF 221 was located in front of a residence on North Montgomery Street, Bremerton.[3] Moments later several officers converged at the reported location. From neighbors, the police ascertained that somewhat earlier the vehicle had come to a fast stop, two male adults got out of the car and ran into the house in front of which the car was parked. Two of the officers approached the house and knocked on the door. A young lady answered the officers' knock. One of the officers had attended school with her and recognized her as being a sister of the Coburne brothers. After a brief conversation, the young lady declared that Charles had been driving the car which was parked in front of the residence.

The officers also learned from a neighbor that another car, described as a 1965 white, two-door hardtop Ford, in a "rather beat" condition, including "a left rear fender smashed with a tail light out," was usually parked in front of the residence.[4] The neighbor told the police that he had

---

[3] Evidence later obtained established that the vehicle was a rental vehicle which Charles Coburne had rented on September 22, 1971.

[4] At trial, Troy Coburne's former wife testified that on the evening of September 23, 1971, she drove this car from Bremerton to Seattle by

heard a car leave the area some time after the Buick arrived.

Both officers knew Charles and Troy Coburne and believed that the description of the two perpetrators of the robbery/murder matched the description of the two brothers. At least one of the officers knew that Troy was an escapee from the penitentiary.

One of the officers, Deputy Sheriff Wiley, then proceeded to another portion of town, to an apartment where Gladys Coburne's mother lived. From talking to persons living at that place, Officer Wiley learned that Charles had been staying in the Seattle area but he was unable to obtain any precise address. Although the encounter was partially hostile, he did learn that two automobiles parked in the vicinity belonged to Charles Coburne. One of those cars, a 1957 two-door Dodge, was parked "in kind of a parking lot alley arrangement—it goes to all the different apartments."

Officer Wiley approached the Dodge, looked in the window and saw a sign on the back seat of the car. From the outside of the vehicle he could tell it was a printed "For Sale" sign, and he could read the words "For Sale," and below that the word "Inquire." He testified that from the outside of the car he could also "read the number 13—or 13th Avenue." He could see there was other writing on the sign but he could not distinguish the words or numbers. He reached in an open front window of the car and picked up the sign. At close range he could read the address number on 13th Avenue, together with an apartment number. He apparently made no attempt to retain the sign, but immediately contacted his headquarters, advising that the information obtained was a possible address in Seattle at which Charles Coburne could be found.

Seattle authorities were advised that Bremerton police had probable cause to arrest Charles and Troy Coburne for the robbery/murder and that they might be found either in

---

way of Tacoma. From Bremerton to Tacoma the two defendants rode in the trunk of the car. At Tacoma she stopped the car and the defendants got in the back seat.

the 1965 Ford or at the apartment address furnished by Officer Wiley. En route to the apartment address, Seattle officers spotted the 1965 Ford. They stopped the car and talked to the two occupants, Gladys Coburne and Troy's former wife. One of the women told them: "This is the car that you are looking for. We are looking for the police." The officers learned that Charles and Troy Coburne had recently been in the car and that they had been dropped off at a drug store, which was never identified to the officers. After cruising around for some time while the two women were "looking" for the place where they had dropped the defendants, the police decided to check the apartment address which had been provided by Officer Wiley.

At the apartment, the officers knocked and identified themselves. Charles Coburne came to the door and he was placed under arrest. Another officer rushed past the apartment door and arrested Troy Coburne, who was standing at an inside hallway.[5] The officer noticed a gun lying on a table—3½ feet from where Troy was standing. Another officer rushed forward and seized the weapon which was subsequently identified as a .22 caliber automatic pistol.[6] On the same table there was a large paper sack and smaller sack with a pair of blue jeans rolled up together. At least one of the officers saw "what looked like ends of currency" around which the jeans had been wrapped. On a sofa in the same room there was a green and yellow pullover, ski-type mask. Other items of property, seized in the main room and in adjoining rooms, were not introduced into evidence at trial.

After the two defendants had been arrested and were standing in the hallway outside the apartment, the police noticed they were not wearing shoes. The brothers told the police their boots were in the main room in front of the

---

[5]The two women had supplied supplemental descriptions of the two brothers, including the fact that Troy's left thumb had been amputated. The supplemental descriptions aided the Seattle police in identifying the two men.

[6]Three shell casings found at the scene of the murder were identified at trial as having been fired by this gun.

sofa. One of the officers went back into the room, got the boots, and the defendants put them on and wore them to the Seattle police station. Later, at the booking desk, Charles' boots became a significant evidentiary item when it was learned that a pair of heels had been located at the murder scene in the same place where the shell casings had been found.[7] All items seized by the Seattle police, including $7,183 in currency, were subsequently transferred to the custody of Bremerton police.

The defendants moved to suppress all items of evidence seized at the Seattle apartment on the theory that they were obtained as a result of an unreasonable search and seizure condemned by the fourth amendment to the United States Constitution. The defendants contend that the search and the seizure were unreasonable on alternative theories: (1) the Seattle police had neither a search warrant nor probable cause to arrest them; (2) even if the Seattle police had probable cause to arrest them, the seizure of the items exceeded the spatial limits of a search incidental to that arrest; (3) the apartment address ultimately supplied to the Seattle police was obtained as the result of an unreasonable search of Charles Coburne's Dodge automobile by Deputy Sheriff Wiley. The trial court denied the motion as to all items which it ultimately permitted to be introduced as evidence at the trial: the weapon, the blue jeans, the paper sacks, the ski mask, and Charles' boots.[8]

The police did seize the items in the Seattle apartment without benefit of a warrant. Therefore, the seizure was per se unreasonable unless it fell within one or more of the recognized exceptions, and the burden was

---

[7]At trial, an FBI agent assigned to the FBI laboratory in Washington, D.C., testified that based upon a series of similarities he concluded "these heels had at one time been attached to" Charles' boots.

[8]No attempt was made to introduce the currency as evidence at the trial. However, Troy's former wife testified that when she was in the Seattle apartment she saw "a lot of money." She also stated that Troy, Charles and Gladys Coburne counted the money and placed it into two piles; Troy's share was wrapped in an old pair of Levis and Charles' share was on the floor when she last saw it.

upon the prosecution to justify the ' warrantless search. *Coolidge v. New Hampshire,* 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971); *State v. Singleton,* 9 Wn. App. 327, 511 P.2d 1396 (1973). Further, when a controversy exists as to a material fact, the trial court must evaluate the credibility of witnesses and resolve the controversy. *State v. Breckenridge,* 4 Wn. App. 328, 481 P.2d 26 (1971).

■ The prosecution contends, and we agree, that all of the items seized in the Seattle apartment, and which were introduced into evidence at the trial, were within the plain view of the officers at the time Troy Coburne was arrested. (We pass, for the moment, consideration of the problem as it relates to Charles' boots.) Accordingly, the prosecution contends, and we agree, that the pistol, the jeans, the paper sacks, and the ski mask were all products of a proper limited search for items within plain view as long as the safeguard requirements for seizure of items following such a search have been met. Those safeguards necessary to justify a "plain view" seizure are (1) a prior justification for the intrusion, if there was an intrusion; (2) an inadvertent discovery of incriminating evidence; and (3) immediate knowledge by the police that they have evidence before them. *State v. Dimmer,* 7 Wn. App. 31, 497 P.2d 613 (1972).

Examining those safeguards in reverse order, it is apparent that when the police arrested these defendants for an alleged robbery/murder, the sight of a weapon (which incidentally was loaded at the time) within 3½ feet of one of the arrestees instilled immediate knowledge to the police that incriminating evidence was before them.[9] Items of outside wearing apparel are always significant items for identification purposes when identification of the perpetrator of a crime is at issue. Seizure of the paper sacks appears to be an insignificant item except that one of them at least was

[9]The state contends, additionally, that seizure of the weapon was authorized under the doctrine of limited search following arrest, authorized by *Chimel v. California,* 395 U.S. 752, 23 L. Ed. 2d 685, 89 S. Ct. 2034 (1969). We need not even reach that question.

rolled up in a bundle with the jeans and some of the currency, the ends of which were visible to the officers. Clearly, also, the discovery of the evidence was inadvertent, not planned.

Before considering whether or not the intrusion into the apartment was justified, we must dispose of a matter which Charles raises in his behalf. He contends that while the items may have been in plain view of the officers who arrested Troy, they were not in plain view of the officers when he (Charles) was arrested. The contention is not well founded. If the search and seizure is reasonable as to Troy, it is reasonable also as to Charles. It must be remembered that Charles was reportedly living in Seattle and this was *his* address. Furthermore, the search being reasonable, because of the circumstances existing at the time of Troy's arrest, the items seized would have been admissible against Charles even if they had incriminated him only. *Hill v. California,* 401 U.S. 797, 28 L. Ed. 2d 484, 91 S. Ct. 1106 (1971).

We turn, then, to whether or not the intrusion was justified. First, Troy raises the issue that none of the eyewitnesses identified him on the night of the robbery/murder. That is correct. However, several of the officers knew him and at least one of them indicated that the description given the police (once he had formed a probable cause that Charles was one of the perpetrators) clearly fit his knowledge of Troy. Furthermore, Troy's former wife told the Seattle police that she had dropped both brothers off at the same place after she had acknowledged that the car she was driving was the car they wanted. Finally, it should be remembered that Troy was a known escapee and was, therefore, subject to arrest on sight.

Charles makes no serious contention that the police did not have probable cause to arrest him, but both defendants assert that the arrest was unlawful and the seizure of the items was unreasonable because the address at which they were found resulted from an unreasonable search of

Charles' Dodge automobile.[10] We find that the limited search of the Dodge automobile conducted by Deputy Sheriff Wiley, if it can be categorized as a "search," was a reasonable search under all the conditions existing at the time it was made. Again, we rely upon the "plain view" doctrine and examine the safeguards previously set forth.

There can be little doubt that the "For Sale" sign was in plain view of anyone who looked in the window at the back seat. The defendants contend, however, that because the precise street number and apartment number were not readable from the outside of the car, the police officer was precluded, by the Fourth Amendment, from seizing the sign in order to bring it closer to his eyes and thus enable him to read the most valuable information on the sign.

Again, examining the three criteria set forth in *State v. Dimmer, supra,* we note first that there was no "intrusion" by the police. The vehicle was parked in an alley parking lot available to all users of the apartments. The area where the car was parked is not a "curtilage" protected by the Fourth Amendment. *Hester v. United States,* 265 U.S. 57, 68 L. Ed. 898, 44 S. Ct. 445 (1924). Further, there was no evidence that Charles lived at this apartment. Accordingly, Officer Wiley was completely justified in examining the vehicle from a position of vantage outside the vehicle.

Secondly, being in hot pursuit of the Coburne brothers, but not knowing precisely where they could be found, Wiley's observation of a partial address on a "For Sale" sign inside Charles' car was an inadvertent discovery of an item which gave him immediate knowledge that usable evidence was before him. He was justified, therefore, in entering the vehicle to seize the sign so as to read the additional mate-

---

[10]The prosecution makes no contention that the address, not incriminating in itself, became so attenuated as to dissipate the taint by reason of the alternative method of finding the defendants through the Ford automobile. *See People v. Kanos,* 70 Cal. 2d 381, 450 P.2d 278, 74 Cal. Rptr. 902 (1969).

rial on the sign which he could see but which the limitation of his eyesight prevented him from precisely discerning.[11]

Indeed, given the exigencies of the circumstances then existing, Wiley's action was the only reasonably prudent police action which could have been taken at that point in time. A "For Sale" sign has, by its nature, a certain invitational quality to it when displayed in any fashion. Certainly in the case at bench, there was no attempt to prevent the general public from reading the sign. It was imperative that Seattle authorities be given the precise address at the earliest possible time. If someone at the Bremerton apartment had chosen to drive the vehicle away, Wiley could not have prevented that action. Obtaining a warrant to search the vehicle was neither feasible nor necessary under all the circumstances.

Finally, Charles' boots were not "seized" at the Seattle apartment. They were seized at the booking desk while Charles was wearing them. The officer who returned to the apartment and removed the boots did so solely for the comfort and convenience of both defendants. Rather than being seized at that point, both pairs of boots were turned over to the defendants who then wore them. There was neither an unlawful search for them nor an unlawful subsequent seizure of them.

We conclude therefore, that the trial court properly denied the defendants' motion to suppress the evidence seized in the Seattle apartment and subsequently introduced into evidence at trial.

## OTHER ISSUES

▉ Without unduly lengthening an already extended opinion, we note simply that the trial court did not commit error in consolidating the two informations for trial. The court meticulously excluded any evidence which even ar-

---

[11]Although the trial court accepted Wiley's narration of events—that he reached in an open window to grasp the sign—other evidence indicated that he opened the door, kneeled on the front seat and then reached to the back seat. Either action would appear to have been justifiable.

guably could have been validly introduced against one, but not both of the defendants.[12] We find no error. *State v. Iddings,* 5 Wn. App. 99, 485 P.2d 631 (1971).

Defendants contend that numerous exhibits were erroneously admitted into evidence either because they were not sufficiently relevant or were not sufficiently identified. We find no abuse of discretion as to the admission of any exhibits by the trial court. Indeed, potential exhibits of questionable value or identity were methodically excluded by the court.

Defendants also contend that the trial court erred by failure to grant their motions for mistrial after (1) one of the officers used the expression "mug shots," and (2) another officer acknowledged that he had known the defendants prior to the date of the robbery/murder. We find no prejudicial error. Throughout the trial several other witnesses, totally without objection, had referred to their examination of "mug shots." The police officer's inadvertent and uncondoned remark, viewed against the background of all the evidence, did not taint the proceedings as to deny the defendants a fair trial. *State v. Nettleton,* 65 Wn.2d 878, 400 P.2d 301 (1965); *State v. Newman,* 4 Wn. App. 588, 484 P.2d 473 (1971). Furthermore, one of the officers testified that he had been a schoolmate of the defendants' sister. The other officer's prior acquaintance of the defendants was not calculated to lead the jury into a belief that they were dealing with a criminal already so notorious as to demand the vigilance of the local police. We find no prejudicial error in the officers' testimony.

Finally, we find no error because the trial court carefully advised the jury of the status of renumbered exhibits. Some explanation was necessary after a conference between counsel and the court resulted in extensive excision and renumbering of parts of exhibits which had already been introduced into evidence. The trial court's explana-

---

[12]Testimony of Troy's former wife was rigidly curtailed. Testimony of the Seattle police officers at the pretrial hearing as to admissions made by Troy while being booked was entirely deleted at trial.

tion of the material changes and the method of such explanation did not constitute an unlawful comment on the evidence. *State v. Lane*, 4 Wn. App. 745, 484 P.2d 432 (1971); *State v. Mellis*, 2 Wn. App. 859, 470 P.2d 558 (1970).

In conclusion, the defendants received an unusually fair trial, which was presided over by a meticulously impartial trial judge.

Judgment affirmed.

PEARSON, C.J., and ARMSTRONG, J., concur.

Petition for rehearing denied March 5, 1974.

Review denied by Supreme Court June 20, 1974.