565 P.2d 873

The STATE of Arizona, Appellee,

v.

Henry MENDEZ, Jr., Appellant.

No. 3786–PR.

Supreme Court of Arizona,
In Banc.

June 9, 1977.

Bruce E. Babbitt, Atty. Gen. by William J. Schafer, III, and Galen H. Wilkes, Asst. Attys. Gen., Phoenix, for appellee.

Jeffrey S. Kaufman, Phoenix, for appellant.

CAMERON, Chief Justice.

The defendant, Henry Mendez, was convicted in a jury trial and found guilty of possession of a narcotic drug in violation of A.R.S. § 36–1002. The defendant admitted a prior felony conviction. He was sentenced to a term of not less than ten nor more than eleven years at the Arizona State Prison. The Court of Appeals, Division One, affirmed. *State v. Mendez*, 115 Ariz. 371, 565 P.2d 877 (1976).

This court granted review pursuant to Rule 31.19, Arizona Rules of Criminal Procedure (1973). The opinion of the Court of Appeals is vacated. Judgment of conviction and sentence reversed.

The sole issue on review is whether the trial court properly denied the defendant's motion to suppress.

The facts necessary for a determination of this issue are as follows. On 2 May 1975, at approximately 10:30 p. m., six or seven police officers arrived at a residence at 1328 East Fillmore, Phoenix, Arizona, to serve a warrant for a search of the premises and of a person named in the warrant as Ernie Mejia. The warrant described Mejia as "M/M [Mexican male], approximately 19–20 years, 5'6", 150 lbs., short brown, afro type

hair, light complexion." The object of the search was narcotics, specifically heroin. As the officers approached the front door, they detected the odor of marijuana. Two adults and three children were inside the house when they entered. The adults, Carmen Hernandez and Arthur Madrid, were taken into custody. The subject of the warrant, Ernie Mejia, was not present. The officers asked Arthur Madrid where Mejia was and he replied that "they" went to the store for some beer and would return.

Five minutes after the arrival of the police, while the search of the house was in progress, Henry Mendez drove up to the house in an older model red Plymouth or Dodge similar to the one known by the officers present to be driven by Ernie Mejia. Mendez was accompanied by Della Bernal, later identified as Ernie Mejia's sister. Mendez and Bernal entered the house without knocking. At the suppression hearing, Officer Applegate testified as follows:

"Q * * * Would you please describe what happened from the time Henry Mendez entered the residence?

"A He was—he entered the residence. The lights were out at the residence. He was carrying a paper bag with something in his—one of the hands. He was immediately taken into custody. The bag was removed from his person; at which time the subject was held by both wrists. He was handcuffed; at which time I asked the subject his name and he replied something to the effect that I should give him his rights.

"Q Let me ask you this. Did you open the contents of the bag?

"A No, I didn't.

"Q Are you aware from your fellow officers as to whether this bag contained any contraband?

"A I imagine the bag was subsequently searched. To my mind there was no contraband in the bag.

"Q What happened in regard to this giving of constitutional rights?

"A I asked if he understood the rights that I just read from a standard rights card and he stated he did. At this time there was a pat-down for weapons by Detective Ivie, and the defendant was escorted into the kitchen where he was patted-down for weapons.

"Q Did anyone choose to put their hands inside of his pockets?

"A No.

"Q I take it then the defendant, my client, indicated that he understood his rights?

"A Yes.

"Q The first right you advised him was, 'You have the right to remain silent,' I take it?

"A That's correct.

"Q What happened after he was taken away?

"A He subsequently was searched by Detective Andrade."

Ten packets of heroin were found in his pants pocket.

Officer Andrade testified that prior to the serving of the warrant he knew an Ernie Mejia who was half Mexican, half Negro, with a large afro, about 5′8″, 170–75 lbs. Furthermore, approximately one to two weeks before the search, he viewed a photograph of the Ernie Mejia named in the warrant. Officer Andrade admitted that prior to searching Mendez he "knew that Mr. Mendez was not the Mejia [he] knew." Nevertheless, Officer Andrade did not communicate this fact to the other officers present at the scene. Officer Andrade testified as follows:

"Q At the time you searched him isn't it also a fact that you knew that the gentleman was not Ernie Mejia?

"A I knew that Mr. Mendez was not the Mejia I knew, sir.

"Q Did you have any concrete information to indicate there was more than one Ernie Mejia in this area of that age, approximately 19 to 20 years, Mexican male?

"A Not to my knowledge.

"Q Are you also aware of the fact that Ernie Mejia, the one you knew, was a half Negro?

"A I did.

"Q Did this gentleman appear to be half Negro to you?

"A No, he did not.

"Q Does he now?

"A No, he does not.

"Q So, you knew that my client was not Ernie Mejia yet you searched him any way?

"A That's correct.

"Q Why did you search him?

"A I was advised to search him.

"Q Did you ever tell anyone prior to searching Henry Mendez that that was not the Ernie Mejia that you knew?

"A I don't believe I did."

The trial court denied the motion to suppress without specifying the grounds therefor.

 An arrest and search based upon a reasonable mistake in identity is lawful. *Hill v. California,* 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971); *State v. Turner,* 112 Ariz. 350, 541 P.2d 1152 (1975). We do not believe, however, the search of the defendant in the instant case can be justified as a reasonable mistake in executing the warrant. One of the officers present knew that the defendant was not Ernie Mejia. A pat-down for weapons had been conducted and none were found. Absent further justification for the search of the defendant, the officer could proceed no further:

"A search for weapons in the absence of probable cause to arrest, however, must, like any other search, be strictly circumscribed by the exigencies which justify its initiation. (citation omitted) Thus it must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby * * *." *Terry v. Ohio,* 392 U.S. 1, 25–26, 88 S.Ct. 1868, 1882, 20 L.Ed.2d 889, 908 (1968).

 Police officers who are executing a search warrant of a particular place may not search persons incidently on the premises without probable cause to do so. *United States v. Di Re,* 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948); *State v. Nabarro,* 525 P.2d 573 (Haw.1974); *Willis v. State,* 122 Ga.App. 455, 177 S.E.2d 487 (1970); *United States v. Festa,* 192 F.Supp. 160 (D.Mass. 1960). And this principle applies to those persons who arrive at a residence being searched for narcotics. *United States v. Branch,* 545 F.2d 177 (D.C.Cir. 1976); *United States v. Smaldone,* 485 F.2d 1333 (10th Cir. 1973); *State v. Ford,* 20 Or.App. 384, 531 P.2d 740 (1975); *Wallace v. State,* 131 Ga.App. 204, 205 S.E.2d 523 (1974); *People v. Smith,* 21 N.Y.2d 698, 287 N.Y.S.2d 425, 234 N.E.2d 460 (1967) (per curiam).

 Mere association with suspected narcotics dealers is not in itself sufficient to establish probable cause:

"The inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security. Nothing resembling probable cause existed until after the search had turned up the envelopes of heroin." *Sibron v. New York,* 392 U.S. 40, 62–63, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917, 934 (1968).

 From the facts in the instant case, there was no probable cause to make the arrest. Nothing which occurred after the arrest, including the fruits of any search, can make the arrest lawful or justify the search. *State v. Edwards,* 111 Ariz. 357, 529 P.2d 1174 (1974); *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). The search was unlawful and the trial court should have granted the defendant's motion to suppress.

The State, however, cites A.R.S. § 13–1446(E) as justification for the search of Mendez:

"§ 13–1446. Service of warrant

 * * * * * *

"E. A peace officer executing a search warrant directing a search of premises or

a vehicle may search any person therein if:

"1. It is reasonably necessary to protect himself or others from the use of any weapon which may be concealed upon the person, or

"2. It reasonably appears that property or items enumerated in the search warrant may be concealed upon the person."

Section 13–1446(E)(1) is not applicable to the facts of this case because the search which uncovered the heroin was conducted after Mendez had been handcuffed and frisked for weapons.

Subsection 2 does not apply as the facts do not support a reasonable assumption that the property enumerated in the search warrant was concealed on the person. The statute, which was amended in 1971, appears to be an attempt by the legislature to comply with the existing law on search and seizure as set forth by the United States Supreme Court. In that A.R.S. § 13–1446(E) achieves this goal, a search pursuant to this statute will be upheld, but the statute may not authorize a search and seizure contrary to the United States Constitution as interpreted by the United States Supreme Court. The interpretation placed upon the statute by the State would do just that and we will not construe the statute as authorizing the search in the instant case.

Judgment reversed.

STRUCKMEYER, V. C. J., and HAYS, HOLOHAN and GORDON, JJ., concurring.