975 So.2d 488 (2007)
Richard RIOS, Appellant,
v.
STATE of Florida, Appellee.
No. 2D06-4381.
District Court of Appeal of Florida, Second District.
July 25, 2007.
*489 James Marion Moorman, Public Defender, and Richard J. Sanders, Assistant Public Defender, Bartow, for Appellant.
Bill McCollum, Attorney General, Tallahassee, and Tiffany Gatesh Fearing, Assistant Attorney General, Tampa, for Appellee.
FULMER, Judge.
Richard Rios was charged with possession of cocaine. After the trial court denied his motion to suppress the contraband, Rios pleaded guilty, reserving the right to appeal the dispositive issue underlying the denial of the motion. We reverse.
Two officers with the Pinellas County Sheriff's Office had an arrest warrant for Robert Rios. They carried with them a jail mugshot of this person, which contained a listing of physical characteristics  black male[1] with black hair and brown eyes; 5'8" tall; 150 pounds. The officers had also done some computer research on Robert Rios and determined that he had a tattoo on his neck saying "Saneta."
When the officers arrived at the address listed on the warrant, they saw in front of the house a "light-skinned black male or Hispanic-looking male" with black hair and dark eyes. The officer responsible for executing the arrest warrant, who provided most of the testimony at the suppression hearing, thought the man was 5'8" to 5'10" tall or maybe a little taller.[2] The officers announced that they were looking for Robert Rios. The man said he was Richard, not Robert. The officers asked for identification. The man said his wife had his driver's license in the house. The backup officer testified that when the officers initially approached the man, he tried to back away toward the house. The backup officer "stood behind him." The warrants officer knocked on the door, but no one answered.
In her testimony, the warrants officer explained that for about fifteen to twenty minutes, she went back and forth between the man and the house, alternating between interacting with the man and trying to get someone's attention inside. The officer finally noticed that the man had a tattoo saying "Saneta" on his neck, whereupon she attempted to place the man in custody. The officers searched him as part of this process and found cocaine. Only after the man was in custody did his *490 wife come out and produce his identification, which demonstrated that he was indeed Richard Rios, the defendant-appellant, not Robert Rios.[3]
In denying Rios's motion to suppress the evidence seized from him, the trial court found that "under all the circumstances within their knowledge at the time of [Richard Rios's] arrest, the officers had probable cause to reasonably believe that [Richard Rios] was in fact the person for whom they had a warrant" and that the search of Rios and the seizure of the cocaine were incident to the lawful arrest.
Our review of the trial court's ruling on a motion to suppress concerns "a mixed question of law and fact. The standard for reviewing facts is whether competent, substantial evidence supports the trial court's factual findings. The historical facts should be reviewed only for clear error. The trial court's application of law is reviewed de novo." E.B. v. State, 866 So.2d 200, 202 (Fla. 2d DCA 2004) (citing Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); Connor v. State, 803 So.2d 598 (Fla.2001)).
The first step in our inquiry is to identify the level of the initial contact between the officers and Rios, whether a consensual encounter or an investigatory stop as described in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).[4] A "consensual encounter . . . involves only minimal police contact. During a consensual encounter a citizen may either voluntarily comply with a police officer's requests or choose to ignore them. Because the citizen is free to leave during a consensual encounter, constitutional safeguards are not invoked." Popple v. State, 626 So.2d 185, 186 (Fla.1993) (citing United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). In contrast, a "citizen encounter becomes an investigatory . . . stop[ ] once an officer shows authority in a manner that restrains the defendant's freedom of movement such that a reasonable person would feel compelled to comply." Parsons v. State, 825 So.2d 406, 408 (Fla. 2d DCA 2002). In short, an investigatory stop occurs when a "reasonable person would not feel free to leave." Hrezo v. State, 780 So.2d 194, 195 (Fla. 2d DCA 2001).
The evidence presented at the motion hearing indicates that the initial contact with Rios was an investigatory stop, not a mere consensual encounter. The backup officer testified that when the warrants officer approached Rios and began talking to him, Rios began backing toward the house. The backup officer then moved behind Rios. The officer testified that his role was to "stand[ ] behind him to cut off any escape route if he tried to run" and to prevent him from going into the house. The warrants officer testified that the process of talking with Rios and knocking on the door lasted fifteen to twenty minutes.
Blocking a person's path or otherwise restraining movement is one indication that a stop has occurred. See, e.g., Alvarez v. State, 515 So.2d 286, 290 (Fla. 4th DCA 1987) (partially blocking suspect's sole exit from train compartment was one factor indicating that a detention had occurred); United States v. Bowles, 625 F.2d 526, 532 (5th Cir.1980) (Fourth Amendment seizure occurred when officer ran past suspect, held out credentials, and *491 turned to face him, thus blocking his path); cf. State v. Livingston, 681 So.2d 762, 763-64 (Fla. 2d DCA 1996) (that officers did not block suspect's path was one factor in court's conclusion that the contact was a consensual encounter); State v. Mitchell, 638 So.2d 1015, 1016 (Fla. 2d DCA 1994) ("An officer may address questions to anyone on the street, and unless the officer attempts to prevent the citizen from exercising his right to walk away, such questioning will usually constitute a consensual encounter rather than a stop."). Because the uncontradicted evidence indicates that Rios was, at the outset of the encounter, prevented by the officers from entering his own house or otherwise leaving the scene, we conclude that the contact between Rios and the officers was a stop from its inception.
The next step in the analysis is to determine whether the officers had reasonable suspicion to support their investigatory stop of Rios. The principle of Terry is that the officers would have been permitted to detain Rios "briefly for an investigatory stop if they ha[d] a reasonable, articulable suspicion based on objective facts that [he] ha[d] engaged in, or [was] about to engage in, criminal activity." United States v. Powell, 222 F.3d 913, 917 (11th Cir.2000); see also Popple, 626 So.2d at 186 ("a police officer may reasonably detain a citizen temporarily if the officer has a reasonable suspicion that a person has committed, is committing, or is about to commit a crime"); § 901.151(2), Fla. Stat. (2006). Furthermore, the reasonable suspicion must exist at the beginning of the investigatory stop. See Terry, 392 U.S. at 19-20, 88 S.Ct. 1868 ("[I]n determining whether the seizure and search were `unreasonable' our inquiry is a dual one  whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."); S.V.J. v. State, 891 So.2d 1221, 1223 (Fla. 2d DCA 2005) ("For reasonable suspicion to exist, the search must be justified at its inception. . . ." (Citation and internal quotation marks omitted.)); cf. Sibron v. New York, 392 U.S. 40, 63, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) ("It is axiomatic that an incident search may not precede an arrest and serve as part of its justification.").
Here, there was no testimony as to present criminal activity in which Rios might have been engaged or potential future criminal activity; indeed, criminal activity during these timeframes was not an issue at all. Moreover, the only potential source of reasonable suspicion as to past criminal acts in which Rios might have engaged was the activity for which his half-brother Robert Rios was to be arrested pursuant to the arrest warrant. However,
"[t]he existence of an arrest warrant is of no moment on the question whether a particular person police officers come across is in fact the subject of the warrant. The warrant supplies the officers with probable cause to arrest the person it names and describes, not a license to duck the reasonable suspicion requirement and stop someone they only have a subjective hunch is that person." United States v. Hudson, 405 F.3d 425, 439 n. 9 (6th Cir.2005).
Dennis v. State, 927 So.2d 173, 175 (Fla. 2d DCA 2006); see also Faunce v. State, 884 So.2d 504, 506 (Fla. 1st DCA 2004) ("To justify an investigative detention, a law enforcement officer must have a reasonable suspicion that a person has committed or is about to commit a crime. A hunch or a mere suspicion is not enough." (Citations omitted.)).
Testimony given by the warrants officer indicates that the officers' initial stop of *492 Rios was based on, at best, a mere hunch and that this level of suspicion continued throughout the encounters. For example, on cross-examination, the officer testified as follows:
Q. But you didn't remain in your vehicle. You actually made contact with him, correct?
A. Yeah. And he was being very evasive during the time that we did make contact with him. And we kept trying to tell him just to calm down and, you know, as soon as we identify who you are, if you're not Robert you don't have anything to worry about.
. . . .
Q. Okay. At the time when you approached, would it be fair to say that there were some differences in what you have as far as information [i.e., the arrest warrant information and mugshot] and what we have here as far as Richard Rios in the driveway, that it's not a complete match?
A. The subject that we have sitting here today looks much different than the subject that we had that night, as well.

. . . .
Q. Okay. So when you approached him, you didn't know for sure that he was Robert Rios.
A. We didn't know that he was not either.
(Emphasis added.) The direct examination of the same officer included the following dialog:
Q. Detective, what made you take this defendant into custody? Is there any other observations [sic] you made on that day?
A. Well, we were trying  I would keep going back to the house, trying to get somebody to come to the door to get his ID. And I would come back to him and talk to him as my partner was, you know, he would stand by and just watch. And as I came back to him, because I was trying to visualize the picture [the mugshot of Robert Rios] that I had in my hand what this subject, Robert, would look like, this photo, I was trying to visualize what that would look like with close-cropped hair 
(Emphasis added.) The officers made no progress in intensifying the level of suspicion beyond the subjective hunch level until finally, after fifteen or twenty minutes, the warrants officer noticed a tattoo on Rios's neck consistent with the description of the tattoo on Robert Rios's neck, whereupon the officers took Rios into custody. We need not determine whether the observation of the tattoo gave the officers probable cause to arrest Rios because his detention up to that point was illegal in light of the lack of reasonable suspicion of his involvement in criminal activity.
In its answer brief the State argues from cases concerning mistaken identity. Hill v. California, 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971), for example, stands for the proposition that when police have probable cause to arrest one party but reasonably mistake another party for the first party, the arrest of the second party is valid. Id. at 803, 91 S.Ct. 1106. The key testimony demonstrating the "reasonabl[e] mistake" in Hill, given by one of the investigating officers, was that the person who answered the door at Hill's apartment and was subsequently arrested (and who turned out to be someone other than Hill) "fit the description exactly of Archie Hill" available to the officer from official records and from two other arrestees who had implicated Hill in a robbery. *493 Id. at 799, 91 S.Ct. 1106. Similarly, in Neal v. State, 456 So.2d 897 (Fla. 2d DCA 1984), an officer observed Neal in a parking lot, mistook him for another man whom the officer knew and for whom the officer was aware that a warrant was outstanding, and arrested Neal. Marijuana was found on Neal in a search incident to the arrest. Id. at 897. We upheld the trial court's denial of Neal's motion to suppress, noting that "[n]o evidence contradicted [the officer's] positive testimony that he mistook Neal for [the subject of the arrest warrant]." Id. at 898.
Here, in contrast, there was no evidence of mistaken identity. Indeed, it took as long as twenty minutes for the warrants officer to make an ostensible connection between Richard Rios and the subject of the arrest warrant. During that period, the warrants officer "was trying to visualize" how the person in front of her could be the person pictured in her documentation. In short, we must conclude that because the officers did not have reasonable suspicion to detain Rios, the detention was illegal. As such, the trial court should have suppressed the contraband found on Rios. Furthermore, the State has not articulated an exception to the exclusionary rule that would enable us to affirm the trial court. We therefore reverse the order denying Rios's dispositive motion to suppress evidence and remand with directions to discharge him.
Reversed and remanded.
SILBERMAN and LaROSE, JJ., Concur.
NOTES
[1] Other information in the officers' possession listed Robert Rios as white.
[2] It would turn out later that the man was 6'2" tall.
[3] Richard Rios testified at the suppression hearing, explaining that the two men were half-brothers having the same mother, named Saneta.
[4] We conclude that the officers' initial encounter with Rios was not an arrest, the third level of police-citizen contact.