Binti WATTS, et al., Plaintiffs,

v.

COUNTY OF SACRAMENTO, et al., Defendants.

No. CIV–S980122DFLGGH.

United States District Court, E.D. California.

Sept. 21, 1999.

Darryl Parker, Seattle, WA, for plaintiff.

Jennifer E. Duggan, Porter, Scott, Weiberg & Delehant, Sacramento, CA, for defendants.

### MEMORANDUM OF OPINION AND ORDER

LEVI, District Judge.

Plaintiffs Binti Watts ("Watts") and Christopher Pryor ("Pryor") bring this action against the County of Sacramento and individual officers of the Sacramento County Sheriff's Department, alleging that the officers improperly entered their home and executed an arrest warrant. Plaintiffs assert federal claims under 42 U.S.C. § 1983 and state causes of action for false arrest, false imprisonment, assault and battery, and intentional infliction of emotional distress.

Defendants move for summary judgment on plaintiffs' section 1983 claims and Watts' state causes of action for false arrest and false imprisonment. Plaintiffs

make a counter motion for leave to amend their complaint.

## I.

On January 26, 1997 at approximately 3:30 P.M., Sacramento's Crime Alert Center received a tip from someone known only as "Michelle" stating that Chris Burgess was seen standing in front of plaintiffs' residence. (Defs.' Mot.Summ.J.Ex. D.) The tipper claimed that Burgess was living there with his girlfriend and two small children, ages 1 and 4. (*Id.*) Burgess was the named suspect in an arrest warrant issued by the Sacramento Superior Court on charges of murder and assault resulting in the death of a child under 8. (*Id.* Ex. E.)

At approximately 10 P.M., Sergeant Bryan Munn of the Sacramento County Sheriff's Department received a computer dispatch requesting that he investigate the Crime Alert tip. (Defs.' Mot.Summ.J.Ex. G; Munn Depo. at 6:16–19.) The dispatch informed officer Munn that (1) Burgess was a black male standing 6"1' and weighing 200 pounds; (2) there was a warrant for Burgess' arrest on à murder charge; and (3) Burgess was possibly located at the above address with his girlfriend and two children. (Defs.' Mot.Summ.J.Ex. G; Munn Depo. at 11:13–16.) The dispatch did not specify that Burgess lived there. (*Id.*)

Communicating with other officers by way of radio and computer, officer Munn assembled a team to investigate the tip. (Munn Depo. at 14:6–15:4.) The officers met at an elementary schoolyard, where Munn passed on the information he had received from the dispatch. (Morace Depo. at 9:13–18; Timberlake Depo. at 7:8–15.) Six officers participated in the call: Morace, Sutherland, Black, Munn, Timberlake, and Baer. (Timberlake Depo. at 7:19–21.)

Plaintiffs and defendants offer different accounts of the events surrounding the entry and detainment of Pryor and Watts. According to the defendants, officer Morace knocked on the door with his gun drawn, and a black male in boxer shorts who generally fit Burgess' description answered. (Munn Depo. at 16:19–23; Morace Depo. at 14:1–14; 20:1–2; Timberlake Depo. at 19:20–21.) Morace asked the man, who turned out to be Pryor, whether his name was Chris and he responded affirmatively. (Munn Depo. at 16:19–23; Morace Depo. at 14:8; Timberlake Depo. at 18:1–2.) Morace then instructed Pryor to back away from the door, put his hands up, and get down on his knees; Morace repeated each of these instructions several times before Pryor complied. (Munn Depo. at 23:11–16, Morace Depo. at 14:1–15:1; 17:9–14; Timberlake Depo. at 19:11–20:13.)

After handcuffing Pryor, Morace seated him in a chair in the kitchen while officers Timberlake and Black performed a protective sweep. (Morace Depo. at 23:13–15; Timberlake Depo. at 20:15–17.) Officer Timberlake found Watts and escorted her to the bedroom where the children were located. (Timberlake Depo. at 22:17–23:10; Watts Depo. at 9:17–19.) After defendants obtained Pryor's identification, Timberlake ran a check on it and discovered it was valid. (Timberlake Depo. at 28:2–10.) At some point, Timberlake also learned that Burgess had identifying tattoos, which were absent from Pryor's body. (Morace Depo. at 29:15–20; Munn Depo. at 23:16–19.) After about one hour, the officers uncuffed Pryor, explained the mistake to him, and left. (Munn Depo. at 25:10–14; 40:8; Morace Depo. at 33:8–15; Timberlake Depo. at 32:15–22.)

Pryor and Watts tell a somewhat different story. They testify that they went to bed at approximately 10 P.M., but were awakened by pounding on the front door a few minutes later. (Pryor Depo. at 41:23–42:5; Watts Depo. at 16:3.) Dressed only in his boxer shorts, Pryor answered the door and told defendants his name was "Chris." (Pryor Depo. at 40:11–15; Pryor Decl. ¶ 2; Watts Decl. ¶ 2.) The officers immediately rushed him, with one officer striking him on the forehead with the bar-

rel of his gun. (Pryor Depo. at 40:23–24; 42:10–17; Pryor Decl. ¶ 3.) Pryor hit the kitchen floor hard, breaking one of the steps in the room. (Pryor Depo. at 30:7–22.) After cuffing Pryor, defendants lifted him up by his cuffs and sat him down, repeatedly telling him he was under arrest and accusing him of being Chris Burgess. (*Id.* at 43:13, 40:17–41:1.)

According to plaintiffs, two officers detained Watts and the couple's two children in the living room. (Watts Decl. ¶ 6.) The officers then searched through their closets, drawers, and clothes, taking a photograph with them on their way out. (Watts Depo. at 10:25–10, 11:19; Pryor Decl. ¶ 6; Watts Decl. 6 ¶ .) Before leaving, they told Pryor that someone named Michelle had played a cruel joke on him. (Pryor Depo. at 45:9–22; Watts Depo. at 13:7–8.) Plaintiffs concede that the officers in no way harmed Watts or the children, (Watts Depo. at 9:14–16; 10:4–6; 18:9–21), and that they did not kick, punch, or hit Pryor once the cuffs were on him, (Pryor Depo. at 50:2–4). Aside from the photograph allegedly taken by defendants, plaintiffs' personal property was unharmed. (Watts Depo. at 11:6–7.)

## II.

To make out a section 1983 claim, a plaintiff must show that the defendant violated a right secured by the Constitution while acting under color of state law. *See* 42 U.S.C. § 1983. Plaintiffs contend that defendants violated their Fourth Amendment right against unreasonable searches and seizures by entering their home, detaining them, conducting a warrantless search of their home and personal property, and using excessive force on Pryor. Defendants move for summary judgment on each of these claims.

### A. Entry into the Pryor's Home

Defendants maintain that there is no triable issue of fact as to whether they violated plaintiffs' Fourth Amendment rights by entering his residence. Defendants argue that they were executing an arrest warrant issued on probable cause

and reasonably believed that Pryor was the person named in the warrant. Because Pryor and Watts have distinct privacy interests under the applicable case law, their illegal entry claims are discussed separately below.

### 1. Pryor's illegal entry claim

■ Where police officers mistakenly but reasonably identify and arrest a person as the person named in an arrest warrant, the arrest does not violate the arrestee's Fourth Amendment right against unreasonable searches and seizures. *See Hill v. California*, 401 U.S. 797, 802, 91 S.Ct. 1106, 1110, 28 L.Ed.2d 484 (1971) (explaining that "when the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest") (citation and internal quotations omitted); *White v. Olig*, 56 F.3d 817, 820 (7th Cir.1995) ("The arrest of a person named in a valid warrant ... even if it turns out to be the wrong individual, will not violate the Fourth Amendment unless the arresting officer acted unreasonably."). Moreover, if police officers have an arrest warrant, they need not secure a search warrant to enter a home to arrest the suspect named in the arrest warrant if they have reason to believe the suspect is present; regardless of whether the suspect resides in the home or is merely visiting there, the arrest warrant suffices to protect the suspect's Fourth Amendment rights. *See Payton v. New York*, 445 U.S. 573, 603, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980) (holding that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within"); *United States v. Underwood*, 717 F.2d 482, 484 (9th Cir.1983) (Browning, C.J.) (reasoning that "[i]f an arrest warrant and reason to believe the person named in the warrant is present are sufficient to protect that person's fourth amendment privacy rights in his own

home, they necessarily suffice to protect his privacy rights in the home of another," since "[a] person has no greater right of privacy in another's home than in his own"), *cert. denied,* 465 U.S. 1036, 104 S.Ct. 1309, 79 L.Ed.2d 707 (1984).

■ At the time defendants entered the Pryors' home, they reasonably believed that Pryor was Burgess, and thus that Burgess was present in the home. Defendants were told by the police dispatcher that Burgess was an African–American male standing 6'1" and weighing 200 pounds, and that a Crime Alert tip placed him at the plaintiffs' residence earlier that day. (Mem.Supp.Mot.Summ.J.Ex. G; Munn Depo. at 6:22–7:6; Morace Depo. at 9:13–18; Timberlake Depo. at 7:8–15.) They were also advised that Burgess' girlfriend "Vinti [sic] Watts" might reside there with her two children. (Mem.Supp. Mot.Summ.J.Ex. G.)

■ Plaintiffs properly point out that the anonymity of the tipper weakens the reliability of the tip. *Cf. United States v. Clark,* 31 F.3d 831, 834 (9th Cir.1994) (explaining that "an anonymous tip is insufficient to establish probable cause absent independent corroboration through police investigation or some other indication of reliability"). The tip was detailed, however, and was corroborated once Pryor opened the door and identified himself as "Chris." (Pryor Depo. at 40:11–15; Munn Depo. at 16:19–23; Morace Depo. at 14:1–15:1; Timberlake Depo. at 18:1–2.) Pryor generally fit Burgess' description, (Morace Depo. at 14:1–15:1), and had given them the suspect's first name.[1]

### 2. *Watts' illegal entry claim*

■ The more difficult question presented here is whether the officers violated Watts' Fourth Amendment rights by entering the home. Watts was not named in the warrant, nor did the officers believe she was the person named in the warrant. While the arrest warrant protected Pryor's right against unreasonable search, "it did absolutely nothing to protect [Watts'] privacy interest in being free from an unreasonable invasion and search of [her] home." *Steagald v. United States,* 451 U.S. 204, 212, 101 S.Ct. 1642, 1648, 68 L.Ed.2d 38 (1981). Accordingly, the arrest warrant plus a reasonable basis for believing Burgess was present is insufficient to justify the search as to Watts; to defeat this claim, the officers must show that they reasonably concluded Burgess was a coresident of her home. *See Perez v. Simmons,* 900 F.2d 213 (9th Cir.1990), *amending* 884 F.2d 1136, 1140 (9th Cir.1988).

There is an intra-circuit split on the level of suspicion necessary to support entry into a third person's home to execute an arrest warrant for another person. In *United States v. Dally,* 606 F.2d 861 (9th Cir.1979), the Ninth Circuit held that the search of a third person's home was lawful because the officers had a "reasonable basis" and "reasonable belief" that the suspect named in the warrant resided in the home. *See id.* at 863; *see also Perez,* 900 F.2d at 213 (holding that officers who enter a home without "reasonable grounds" for believing the suspect named in an arrest warrant is a resident of the home violate the third party homeowner's Fourth Amendment rights). But in *United States v. Harper,* 928 F.2d 894 (9th

1. Plaintiffs do not contend that the initial knock on their door triggered Fourth Amendment protections, nor could they; "a suspect who voluntarily opens the door of his dwelling in response to a noncoercive knock by the police ... expose[s] himself in a public place." *United States v. Vaneaton,* 49 F.3d 1423, 1426, 1427 (9th Cir.1995). Nothing in the record suggests the officers used force, threats, or subterfuge to get Pryor to open the door. Officer Morace knocked on the door twice, (Morace Depo. at 14:1–3); Pryor asked who was at the door, (*id.*); Morace replied that it was the police, (*id.*) and Pryor opened the door, (*id.;* Pryor Depo. at 40:7–8). *Cf. United States v. Jerez,* 108 F.3d 684, 693 (7th Cir.1997) (holding that the Fourth Amendment was triggered where police officers knocked on a motel door at 11 P.M. for three minutes, shined a flashlight into the motel room, invoked their authority as officers, and demanded that the occupants open the door).

Cir.1991), the court held that "the police may enter a home with an arrest warrant only if they have probable cause to believe the person named in the warrant resides there." *Id.* at 896. The Ninth Circuit has thus noted that there is an "apparent tension between *Harper*'s probable cause standard and the 'reasonableness' standard enunciated in *Dally*." *United States v. Watts*, 67 F.3d 790, 795 (9th Cir.1995), *rev'd on other grounds*, 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (reversing on sentencing issues).

 It is unnecessary to resolve this issue here because the officers had probable cause to believe that Burgess was a resident of the Pryor home.[2] The anonymous tipper advised Crime Alert that Burgess was living at the Pryor residence with his girlfriend and two small children. Although the dispatcher only told the officers in the field that Burgess was seen at the residence, and did not relate the tipper's statement that Burgess was living there, "an arresting officer need not have personal knowledge of the facts indicating probable cause; rather, an arresting officer may rely on the collective knowledge of the other officers involved in the case." *United States v. Bertrand*, 926 F.2d 838 (9th Cir.1991). Pryor generally matched the description of Burgess, and identified himself as Chris. It was 10 P.M., and Pryor came to the door wearing only his boxer shorts, a strong indication that he was sleeping at the residence. Based on their collective knowledge of the tip and the corroborating facts, the officers had probable cause to believe that Pryor was a resident and therefore to enter the home and make the arrest.

Watts' illegal entry claim, like Pryor's, fails as a matter of law.

## B. Arrest of Pryor and Detention of Watts

Plaintiffs claim that defendants improperly arrested Pryor and detained Watts. Defendants argue that they had the authority to detain Pryor and Watts as a matter of law. The court agrees.

 Because defendants had reason to believe Pryor was Burgess, it was proper for them to arrest Pryor based upon the arrest warrant for Burgess. *See Hill*, 401 U.S. at 802, 91 S.Ct. at 1110. Defendants also acted reasonably when they detained Watts. Once the officers were lawfully in plaintiffs' home, they could briefly detain any other persons inside while they completed their arrest and investigation. *See United States v. Vaughan*, 718 F.2d 332, 334–35 (9th Cir.1983) (holding that police officers executing arrest warrants could reasonably detain a companion of the suspects named in the warrants for the duration of the arrests); *see also Michigan v. Summers*, 452 U.S. 692, 704, 101 S.Ct. 2587, 25: 5, 69 L.Ed.2d 340 (1981) (holding that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted").

 Moreover, officers lawfully inside a residence may conduct a limited stop of a person found on the premises if they reasonably believe that the person presents a potential danger to their safety. *See Murdock v. Stout*, 54 F.3d 1437, 1442 (9th Cir.1995) (reasoning that officers who encountered an uncooperative person while lawfully in a home "acted reasonably in briefly seizing [him] and conducting a pat down search to look for weapons"); *United States v. Flett*, 806 F.2d 823, 827–28 (8th Cir.1986) (concluding that it was reasonable for officers executing an arrest warrant to detain briefly and pat down a person found on the premises where the officers had reason to suspect he might be a gang member). It was reasonable for the defendants to stop and detain Watts once they were in her home; Burgess was wanted for a serious offense, and defendants were justified in believing, at least

---

2. Were the court to reach the defense of qualified immunity, the uncertainty in the Ninth Circuit law on this question would be important.

initially, that Pryor was Burgess and that he and Watts were companions. In the circumstances, a prudent officer would not have allowed Watts to roam about the house while they arrested and interrogated her companion.

Defendants did not detain Watts for an unreasonable period of time, nor was their conduct during the detention unreasonable. Defendants were in the Pryor home for under an hour, and left upon realizing that they had the wrong person. (Munn Depo. at 25:10–14; Morace Depo. at 33:8–15; Timberlake Depo. at 32:15–22.) While detaining Watts, the officers asked her questions, (Watts Depo. at 14:4–9), but never placed handcuffs on her, (*id.* at 16:9–10.) Watts concedes the defendants caused her no physical harm or injury. (*Id.* at 9:14–16.)

Because plaintiffs have failed to raise a triable issue of fact as to whether they were detained in violation of the Fourth Amendment, defendants are entitled to summary judgment on this claim.

### C. Protective Sweep

Plaintiffs contend that the defendants violated their Fourth Amendment Rights by searching their home and personal belongings. Defendants argue that they searched the home as part of a reasonable protective sweep. Plaintiffs have the better of the argument.

In *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), the Supreme Court upheld the constitutionality of protective sweeps, "quick and limited search[es] of premises, incident to arrest and conducted to protect the safety of police officers or others." *Id.* at 327, 110 S.Ct. at 1094. The Court explained that "as an incident to arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately

launched." *Id.* at 334, 110 S.Ct. at 1098. The Court cautioned, however, that "[b]eyond that ... there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.; see also United States v. Hoyos*, 892 F.2d 1387, 1396 (9th Cir.1989) ("Officers who have effected an arrest at a residence may conduct a limited search for persons who may destroy evidence or pose a threat to the officers' safety, if the officers can point to articulable facts that support their belief that others may be on the premises.").

 Defendants were justified in conducting a protective sweep after subduing and arresting Pryor. Plaintiffs have raised a triable issue of fact, however, as to the scope of the officers' search. The arrest took place in the entryway and kitchen, (Pryor Decl. ¶¶ 2–3), but plaintiffs have submitted evidence indicating that the search extended beyond immediately adjoining spaces that could have potentially harbored an attacker. Specifically, plaintiffs aver that the officers methodically searched their bedrooms, looking through their closets, drawers, and clothes.[3] (Watts Depo. at 11:1–5; Watts Decl. ¶ 6; Pryor Decl. ¶ 6.)

 Defendants have failed to point to articulable facts that reasonably support the conclusion that a potential attacker might have been hiding in the more remote parts of the home. The officers were told that Burgess might be living with a girlfriend and two children, but the officers identified and collected Watts and the two children immediately after arresting Pryor. Moreover, even were it reasonable for the officers to conduct a cursory sweep of plaintiffs' bedrooms for other people, they had no justification for searching in places in which a person could not be

---

**3.** Although officer Timberlake insists that neither she nor any of the other officers opened plaintiffs' drawers, (Timberlake Depo. at 28:20–3), plaintiffs' testimony to the contrary suffices to raise a triable issue of fact as to the scope of the officers' protective sweep.

hiding, such as a bureau drawer. Because a protective sweep is designed only to ensure that the area surrounding the site of an arrest is safe, the scope of such a search may extend only to "those spaces where a person may be found." *Buie,* 494 U.S. at 335, 110 S.Ct. at 1099. Police officers therefore may not open and rummage through drawers or clothes and may not examine papers or photographs under the guise of conducting a protective sweep. *Cf. United States v. Tobin,* 923 F.2d 1506, 1513 n. 7 (11th Cir.1991) (upholding the district court's suppression of evidence found in a drawer while conducting a protective sweep); *United States v. Owens,* 782 F.2d 146, 151 (10th Cir.1986) ("The officers' stated objective of securing the immediate arrest area cannot be stretched to justify their searching the closed bag found within a closed drawer."). Indeed, courts upholding protective sweeps often highlight the fact that the officers did not open drawers. *See, e.g. United States v. Gardner,* 627 F.2d 906, 909 (9th Cir.1980) (Kennedy, J.) (holding that the protective sweep at issue was reasonable in scope, and observing that "[t]he agents did not engage in general rummaging and did not open any dresser drawers"); *United States v. Richards,* 937 F.2d 1287, 1292 (7th Cir.1991) (holding that the protective sweep at issue was not impermissibly broad, since the officers "did not search through drawers or dawdle in each room looking for clues").

Because plaintiffs have raised a triable issue as to whether the officers in this case had the requisite level of suspicion to search the entire home, and because there is a factual dispute as to the scope of the search, the defendants are not entitled to summary judgment on the constitutionality of their protective sweep.[4]

### D. Excessive Force

Defendants maintain that officer Munn is entitled to summary judgment on Pryor's excessive force claim because lifting a suspect up by the handcuffs is a *de minimis* use of force. This argument lacks merit.[5]

The Fourth Amendment prohibits officers from using unreasonable force to arrest someone. *See Graham v. Connor,* 490 U.S. 386, 394–95, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). In determining whether the police used unreasonable force, the court must weigh the nature and amount of force used against "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396, 109 S.Ct. at 1872. "Because questions of reasonableness are not well-suited to precise legal determination, the propriety of a particular use of force is generally an issue for the jury." *Chew,* 27 F.3d at 1440.

4. Defendants maintain that even if a triable issue of fact exists as to the constitutionality of their protective sweep, they are entitled to qualified immunity as a matter of law. An officer is entitled to qualified immunity if his action was objectively reasonable "in light of the legal rules that were clearly established at the time it was taken." *Chew v. Gates,* 27 F.3d 1432, 1446 (9th Cir.1994) (citation and internal quotations omitted). "This standard requires a two-part analysis: 1) Was the law governing the official's conduct clearly established? 2) Under that law, could a reasonable officer have believed the conduct was lawful?" *Act Up!/Portland v. Bagley,* 988 F.2d 868, 871 (9th Cir.1993). At the time the officers conducted the search of the Pryor home, the law governing the scope of their protective sweep was clearly established. In *Buie* itself, the Supreme Court emphasized that before conducting a protective sweep, an officer must have articulable facts indicating that "the area to be swept harbors an individual posing a danger to those on the arrest scene." 494 U.S. at 334, 110 S.Ct. at 1098. And cases decided prior to the events at issue here rejected the idea that officers could rummage through drawers while conducting a protective sweep.

5. Because plaintiffs concede that officers Timberlake and Black were not involved in the abusive conduct alleged in their complaint, Timberlake and Black are entitled to summary judgment on Pryor's excessive force claim.

■ Defendants have failed to establish that lifting Pryor by his handcuffs was a reasonable use of force as a matter of law. Although the officers had reason to fear for their safety, a jury could reasonably conclude that it was unnecessary to lift Pryor up by the cuffs under the circumstances. Pryor was restrained by that point, and the record suggests that he was cooperative with the officers. (*E.g.,* Munn Depo. at 28:9–17; Pryor Depo. at 45:5–8.)

Defendants' motion for summary judgment is denied as to Pryor's excessive force claim.[6]

### E. Municipal Liability

Defendants argue that no triable issue of fact exists as to whether the County of Sacramento is liable for the individual officers' conduct.

■ A plaintiff may recover from a municipality under section 1983 if his injury was inflicted under a city policy, regulation, custom, or usage. *See Monell v. Department of Soc. Servs.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). The plaintiff must establish "(1) that the plaintiff possessed a constitutional right of which she was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation." *Plumeau v. School Dist. #40 of County of Yamhill,* 130 F.3d 432, 438 (9th Cir.1997) (citation and internal quotations omitted).

Because defendants are entitled to summary judgment on the merits of plaintiffs' claims under section 1983 for illegal entry and detention, the court need not determine whether municipal liability lies for those claims. This leaves plaintiffs' section 1983 claims based upon the protective sweep and the use of excessive force against Pryor.

■ Plaintiffs have failed to adduce any evidence showing that Sacramento County had a policy regarding the breadth of protective sweeps or the practice of hoisting defendants up by their handcuffs. There is no showing that the County failed to train its officers in the proper scope of protective searches or the proper use of force. Accordingly, the County of Sacramento is entitled to summary judgment on plaintiffs' section 1983 claims based on these actions.

### III.

Plaintiffs have voluntarily dismissed Pryor's state law causes of action. Defendants maintain that no triable issue of fact exists regarding Watts' causes of action for false arrest and false imprisonment.

■ California law does not distinguish between the torts of false arrest and false imprisonment: "[f]alse arrest is but one way of committing a false imprisonment." *Asgari v. City of Los Angeles,* 15 Cal.4th 744, 752 n. 3, 63 Cal.Rptr.2d 842, 846 n. 3, 937 P.2d 273 (1997) (citation and internal quotations omitted); *accord Martinez v. City of Los Angeles,* 141 F.3d 1373, 1379 (9th Cir.1998). False imprisonment is "the nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time, however short." *Molko v. Holy Spirit Ass'n for the Unification of World Christianity,* 46 Cal.3d 1092, 1123, 252 Cal.Rptr. 122, 139, 762 P.2d 46 (1988) (citation and internal quotations omitted).

■ As noted above, defendants detained Watts while they arrested Pryor and determined his identity. The deten-

---

6. Although neither party devotes much attention to it, Pryor also claims that Officer Morace used excessive force by striking him on the head with the barrel of his gun. (Pryor Decl. ¶ 3.) Defendants have failed to show, as a matter of law, that the blow was reasonable in the circumstances or merely accidental. *Cf. Yates v. City of Cleveland,* 941 F.2d 444,

447 (6th Cir.1991) (observing in an excessive force case that "mere negligence may not serve as a basis for a section 1983 claim"). To the extent that plaintiff intends to pursue the allegation that he was struck on the head, defendants are not entitled to summary judgment on this aspect of the excessive force claim either.

tion was brief and resulted in no physical harm or discomfort to her. Because there is no triable issue of fact as to whether the officers acted reasonably in briefly stopping Watts, their conduct was privileged as a matter of law, and her action for false imprisonment will not lie. Moreover, the County of Sacramento is also entitled to summary judgment on Watts' false arrest and false imprisonment causes of action, since the county's liability is derivative of individual officer liability under California law. *See* Cal. Gov't Code § 812.5(a) ("A public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his representative.").[7]

### IV.

Plaintiffs seek leave to amend to assert a cause of action under California law for negligence. Plaintiffs invoke Rule 15's liberal standard for pleading amendments, but Rule 16 governs the permissibility of pleading amendments once a scheduling order has been issued. *See Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607–08 (9th Cir.1992). Under Rule 16(e), the scheduling order "control[s] the subsequent course of the action" unless modified by the court. Fed.R.Civ.P. 16(e).

The pretrial scheduling order in this case states that the complaint may be amended only "with leave of court, good cause having been shown." (Status order at 1:24–6.) Discovery had been closed for two and one-half months when this motion was made, and plaintiffs had already been permitted to amend once.[8] Plaintiffs have not explained why they could not have either asserted their negligence theory in their First Amended Complaint or moved to amend immediately after the conclusion of discovery.

Because plaintiffs have failed to show good cause for their delay, their motion for leave to amend is denied.

### V.

Defendants' motion for summary judgment is GRANTED as to (1) plaintiffs' section 1983 claims against the County of Sacramento; (2) plaintiffs' section 1983 claims against the individual defendants for illegal entry and detention; (3) Watts' state causes of action for false arrest and false imprisonment. The motion is DENIED as to plaintiffs' section 1983 claims against the individual defendants based upon defendants' protective sweep and their use of force against Pryor.

Plaintiffs' motion for leave to amend is DENIED.

IT IS SO ORDERED.

---

7. The parties contest whether counsel for Watts agreed to drop her cause of action for intentional infliction of emotional distress. The court declines to resolve this dispute, but grants defendants leave to move for summary judgment on the merits of Watts' emotional distress claim.

8. The First Amended Complaint was lodged with the court on October 29, 1998. Discovery concluded on November 2, 1998.