**UNITED STATES OF AMERICA, Plaintiff**

**v.**

**DAJER CUEVAS-REYES, and ELIUD GÓMEZ-GARCIA, Defendants**

Criminal No. 2007-66

District Court of the Virgin Islands

Division of St. Thomas and St. John

February 25, 2008

ISHMAEL MEYERS, JR., AUSA, St. Thomas, U.S.V.I., *For the Plaintiff.*

JESSE A. GESSIN, AFPD, St. Thomas, U.S.V.I., *For defendant Eliud Gómez-Garcia.*

DARREN JOHN-BAPTISTE, ESQ., St. Thomas, U.S.V.I., *For defendant Dajer Cuevas-Reyes*.

GÓMEZ, *Chief Judge*

## MEMORANDUM OPINION

(February 25, 2008)

Before the Court is the motion of Eliud Gómez-Garcia ("Gómez-Garcia"), joined by Dajer Cuevas-Reyes ("Cuevas-Reyes") (together, the "Defendants"), to suppress all evidence obtained as a result of the search and seizure of an airplane on November 20, 2007. Additionally, Gómez-Garcia moves to suppress any statements he made to the officers after his arrest. A suppression hearing was conducted in this matter on January 31, 2008. At the conclusion of the hearing, the Court denied the motion to suppress. This Memorandum Opinion memorializes the Court's January 31, 2008, ruling.

## I. FACTS

On November 20, 2007, Customs and Border Patrol Officer Williams Santiago was patrolling the Cyril E. King airport in St. Thomas, U.S. Virgin Islands. On that day, Officer Santiago was investigating a tip that people would be transporting illegal aliens to and from St. Thomas on small private aircraft. Pursuant to the tip, Officer Santiago was instructed to patrol the north runway.

While conducting surveillance, Officer Santiago saw people boarding a small privately owned airplane on the north runway. The plane's engines were running, and after the last person boarded it began to taxi down the runway for takeoff. Officer Santiago called the air traffic control tower and asked that the tower deny takeoff so he could perform an "enforcement boarding." At the suppression hearing, Officer Santiago explained that an "enforcement boarding" involved the Customs and Border Patrol officers boarding an aircraft to ensure that it had an accurate passenger manifest declaring the identities and nationalities of all the passengers on board.

After takeoff was denied, the plane returned to the place where it was originally idling. Officer Santiago approached the airplane and asked the pilot, Gómez-Garcia, to step out of the aircraft. Gómez-Garcia complied. Officer Santiago asked Gómez-Garcia to state his name, destination, and

asked for a passenger declaration. Gómez-Garcia responded that they were headed to Santo Domingo, Dominican Republic, and that they did not have a passenger declaration. Officer Santiago then asked the five passengers of the airplane to get out of the plane. The passengers included Cuevas-Reyes, as well as four females.

Officer Santiago asked one of the female passengers where she was from. The passenger admitted that she was from Santo Domingo and was present in the U.S. Virgin Islands illegally. The other three women also indicated that they were citizens of the Dominican Republic, and were unlawfully present in the U.S. Virgin Islands. Thereafter, all six people were transported to the Customs and Border Patrol facility at the airport.

At the Customs and Border Patrol facility, Gómez-Garcia told the officers that he wanted a Spanish interpreter. Gómez-Garcia was advised of his rights in Spanish. The interpreter then asked Gómez-Garcia in Spanish whether he understood the *Miranda*[1] warnings, and Gómez-Garcia responded in the affirmative. The officers also gave Gómez-Garcia an explanation of rights form in Spanish, which he was allowed to read twice. Gómez-Garcia verbally confirmed in Spanish that he understood the explanation of rights form, and then signed the form. Thereafter, Gómez-Garcia gave a statement to the officers.

A criminal complaint was filed against the Defendants on November 21, 2007, charging them with unlawfully harboring and transporting illegal aliens. The complaint was followed by an indictment, which was returned by the grand jury on December 6, 2007.

## II. ANALYSIS

### A. Evidence

The Defendants argue that the stop of the aircraft on November 20, 2007, and their subsequent arrests, occurred in violation of their rights under the Fourth Amendment. They claim that any evidence obtained as a result of the search and seizure of the airplane should be suppressed as the fruit of the poisonous tree.

---

[1] *See Miranda v. Arizona*, 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

██ The Fourth Amendment protects citizens "against unreasonable searches and seizures." U.S. CONST., amend. IV.[2] "What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *United States v. Montoya de Hernandez*, 473 U.S. 531, 537, 105 S. Ct. 3304, 87 L. Ed. 2d 381 (1985). There is a presumptive requirement that searches or seizures be carried out pursuant to a warrant. *See Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) ("[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.") (internal citations omitted)).

█ In some instances, warrantless searches or seizures will be considered reasonable if based on probable cause. *See Hill v. California*, 401 U.S. 797, 804, 91 S. Ct. 1106, 28 L. Ed. 2d 484 (1971) ("[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment. . . ."). For example, the police may search a vehicle without a warrant if they have probable cause to do so. *Ornelas v. United States*, 517 U.S. 690, 693, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996). The police may also lawfully arrest a suspect without a warrant if the officer has probable cause to believe the suspect has committed a felony and the arrest does not occur in the suspect's home. *See Maryland v. Pringle*, 540 U.S. 366, 373-74, 124 S. Ct. 795, 157 L. Ed. 2d 769 (2003) (upholding a warrant-less arrest where the police had probable cause to believe the defendant had committed a felony after they found cocaine within his reach).

█ Probable cause exists where the totality of the circumstances known to the officers at the time supported a fair probability that the suspect had committed or was committing a crime. *See Ornelas*, 517 U.S. at 696; *Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 13 L. Ed. 2d 142 (1964); *Brinegar v. United States*, 338 U.S. 160, 175-76, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949). Whether probable cause exists is an objective inquiry. *See Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

---

[2] The Fourth Amendment has been extended to the United States Virgin Islands by section 3 of the Revised Organic Act of 1954, 48 U.S.C. § 1561, entitled "Bill of Rights."

■ Even without probable cause, an officer may "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). Similarly, an officer may stop a moving vehicle to investigate a reasonable and articulable suspicion that its occupants were involved in criminal activity. *Ornelas*, 517 U.S. at 693; *United States v. Hensley*, 469 U.S. 221, 226-27, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985).

■ Reasonable suspicion has been characterized as "a particularized and objective basis for suspecting the person stopped of criminal activity." *Ornelas*, 517 U.S. at 695 (quotations omitted). Courts must look to the totality of the circumstances of each case to determine whether reasonable suspicion exists. *United States v. Arvizu*, 534 U.S. 266, 273-74, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002). Law enforcement officers may use their own training and experience "to make inferences . . . and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* (citations and quotations omitted). Reasonable suspicion may not, however, be based on an officer's hunch alone. *Id.* at 274. The likelihood of criminal activity required for reasonable suspicion is lower than that required for probable cause. *Id.* Additionally, "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Id.* at 277.

■ Here, Officer Santiago was investigating a tip that similar aircraft would be unlawfully transporting illegal aliens using the north runway of the Cyril E. King airport in St. Thomas. Officer Santiago then observed a small, twin-engine aircraft fitting the description of the aircraft described in the tip, on the same runway as indicated in the tip. Additionally, the plane's engines were running, and Officer Santiago concluded that the plane was preparing for takeoff. Based on the totality of the circumstances, Officer Santiago had reasonable suspicion to make the initial stop of the airplane. *See United States v. Sharpe*, 470 U.S. 675, 682 n.3, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985) (finding reasonable suspicion based on an officer's observation that a truck had a camper shell similar to those often used to transport drugs that was driving with a car and evading police); *see also Arvizu*, 534 U.S. at 274 (explaining that the degree of certainty required to establish reasonable suspicion is less than

that required for probable cause). Because there was objectively reasonable suspicion to stop the aircraft, the initial stop of all of its occupants was also lawful. *See, e.g., Maryland v. Wilson,* 519 U.S. 408, 414, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997) (holding that officers could not only stop passengers but order them out of the vehicle during a lawful stop without violating their Fourth Amendment rights).

Accordingly, Officer Santiago could properly stop the aircraft to confirm or dispel his suspicion that it was engaged in criminal activity.

 Immediately upon asking the passengers of the aircraft basic questions such as their names and destinations, all four of the female passengers told Officer Santiago that they were illegally in the U.S. Virgin Islands and were traveling to Santo Domingo. The admissions of the women combined with the totality of the circumstances described above gave Officer Santiago probable cause to search and seize the aircraft, and to arrest Gómez-Garcia and Cuevas-Reyes. *See, e.g., United States v. Laville,* 480 F.3d 187 (3d Cir. 2007) (holding that probable cause existed to arrest the defendant for alien smuggling offenses where, while investigating a tip that a boat had run aground in the harbor and illegal aliens were coming ashore, the officer saw such a boat in the harbor, and a group of persons sitting nearby on the boardwalk identified themselves as Cubans who had come off the boat, amongst other facts). Accordingly, any evidence seized as a result of searching the airplane was obtained as a result of a lawful search.

## B. Statements

Gómez-Garcia also argues that the statements he made to the agents at the Customs and Border Patrol office after his arrest should be suppressed.

 Statements obtained during the custodial interrogation of a defendant who has not been read his *Miranda* rights are inadmissible at trial.[3] *See Miranda v. Arizona,* 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Two elements must be present for *Miranda* to apply. First, the defendant must have been in police custody at the time the

---

[3] When a defendant is subject to custodial interrogation by the police, procedural safeguards are necessary to preserve the defendant's Fifth Amendment privilege against compelled self-incrimination. *Miranda v. Arizona,* 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) (holding that absent procedural safeguards, there is an irrebuttable presumption of coercion when a defendant is interrogated while in police custody).

statements were made. *See, e.g., Yarborough v. Alvarado*, 541 U.S. 652, 662-63, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004) (holding that custody for *Miranda* purposes is determined by examining the totality of the circumstances surrounding interrogation and determining whether a reasonable person would have felt free to terminate the interrogation and leave). A defendant who is under arrest is clearly in custody. *See Orozco v. Texas*, 394 U.S. 324, 329, 89 S. Ct. 1095, 22 L. Ed. 2d 311 (1969) ("Once arrest occurs, the application of *Miranda*, is automatic."). Second, the police must have interrogated the defendant, which includes not only direct questioning, but any words or actions that the police should know are reasonably likely to elicit an incriminating response. *Rhode Island v. Innis*, 446 U.S. 291, 301-02, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980).

A defendant who has been advised of his *Miranda* rights may waive them, as long as such waiver is knowing, intelligent, and voluntary under the totality of the circumstances. *See Moran v. Burbine*, 475 U.S. 412, 422-23, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986). "The prosecution bears the burden of proving, at least by a preponderance of the evidence, the *Miranda* waiver . . . . " *Missouri v. Seibert*, 542 U.S. 600, 609, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004) (citation omitted). "The voluntariness of a waiver of [the Fifth Amendment] privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Colorado v. Connelly*, 479 U.S. 157, 170, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986) (reasoning that the Fifth Amendment is solely concerned with protection from governmental coercion). Either physical or psychological coercion by law enforcement may render a *Miranda* waiver involuntary. *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir. 1986).

Here, Gómez-Garcia was clearly in police custody when he made a statement to the agents. The agents were therefore required to advise Gómez-Garcia of his rights to remain silent and to counsel before subjecting him to interrogation. The evidence in this case shows that Gómez-Garcia was read his rights in his native language of Spanish, after specifically requesting a Spanish interpreter. He also verbally confirmed that he understood his rights, and waived his rights in writing. There is nothing in the record to suggest that the warnings given to Gómez-Garcia were defective in any way. Nor is there any evidence showing that Gómez-Garcia was subjected to repeated or prolonged questioning at the time he waived his rights, or when he made his statements.

Given the totality of the circumstances, the Court finds that Gómez-Garcia knowingly, intelligently, and voluntarily waived his *Miranda* rights. *See, e.g., Moran*, 475 U.S. at 422-23 (validating the defendant's waiver of his *Miranda* rights because such waiver was uncoerced, the defendant knew he could remain silent and request a lawyer, and he was aware of the government's intention to use his statements against him); *Miller*, 796 F.2d at 611-12 (holding that a defendant's confession was voluntary, despite police interrogation tactics aimed at winning the defendant's trust and making him feel more comfortable about confession); *United States v. Lux*, 905 F.2d 1379, 1382 (10th Cir. 1990) (finding the defendant's statements voluntary, notwithstanding the fact that the detective lied to the defendant about her codefendant's statement, leaned over and hit his fist on the table, and accused the defendant of lying).

## III. CONCLUSION

For the foregoing reasons, the Court will deny the Defendants' motion to suppress in its entirety. An appropriate order follows.