People v Jones (2026 NY Slip Op 01447)

People v Jones

2026 NY Slip Op 01447

Decided on March 17, 2026

Court of Appeals

Halligan, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on March 17, 2026

No. 20 

[*1]The People & c., Respondent,
vJoseph C. Jones, Appellant.

James A. Hobbs, for appellant.
Amy N. Walendziak, for respondent.

HALLIGAN, J.:
Mistakenly believing the defendant was the target of their arrest warrant, a group of parole investigators approached and then chased the defendant. During the pursuit, they observed him discard a firearm. The defendant was arrested and eventually pleaded guilty to a single count of attempted criminal possession of a weapon. We conclude that the gun, along with the other recovered evidence, should have been suppressed because there is no record support for the lower courts' finding that the investigators' pursuit of the defendant was justified. Accordingly, we reverse.I.
Defendant Joseph C. Jones was indicted on two counts of criminal possession of a weapon in the second degree and one count of possession of a controlled substance in the seventh degree. He moved to suppress the two handguns and the narcotics recovered after the arrest on the ground that the pursuit was illegal.
At the suppression hearing, a Department of Corrections and Community Supervision parole investigator testified that a DOCCS apprehension team had set out to locate a parole absconder for whom they had an arrest warrant. None of the team members were personally familiar with the absconder, but they were given a document with his booking data. That information included a photo and described his height as 6' 01", his weight as 180 pounds, his race and hair as "black," his eyes as "brown," and his skin tone as "medium brown."
The team interviewed the absconder's girlfriend, who suggested that he "may be in" a certain city block in Rochester [FN1]. Nearly an hour later, the team traveled to that area. The investigator testified that he and his partner were in an unmarked vehicle and plainclothes when they observed the defendant walking from the direction of that city block. The investigator testified that he observed, from a distance of about twenty yards, that the defendant was "right around five-eleven, one-eighty-five to two hundred pounds, and [ ] was wearing a black ski mask." He said this observation had "significance," because the absconder's description was "five — eleven, one hundred eighty pounds, one hundred and eighty-five pounds." Because of the ski mask, the investigator was unable to identify the defendant's race, his facial features, or other identifying characteristics. The partner likewise testified that the defendant "met the physical — approximate physical description of the individual [they] were looking for" but did not offer anything more specific.
At this point the team was travelling in separate vehicles, with the investigator and his partner following 20 to 30 yards behind a car holding another team member. As that car pulled alongside the defendant, he began to run. Because the approaching team member did not testify at the suppression hearing, nothing in the record reflects whether that officer and the defendant interacted or exchanged any words; Supreme Court found in its suppression ruling only that "a member of the 'team' pulled alongside [the defendant] at which point [the defendant] began to run away from the location."
The investigator and his partner then exited their vehicle and chased the defendant because they "thought that he was the parole absconder," although they also acknowledged that they had not observed him "commit any criminal activity" and that it was "not a crime for him to run." In the course of the pursuit, the investigator observed the defendant discard a black handgun. Upon catching up with the defendant, the pair took him into custody and realized for the first time that he was not the absconder named in the warrant. In conducting a search incident to arrest, the investigator discovered a medicine bottle with six vials containing a white rock substance. He also recovered the black handgun he had seen the defendant discard, as well as a silver handgun discovered along the defendant's flight path, although neither the investigator nor his partner had seen the defendant in possession of the silver handgun.
Supreme Court denied suppression, applying a rule for mistaken arrests derived from the U.S. Supreme Court's decision in Hill v California (401 US 797 [1971]). The court credited the testimony of the investigator and his partner and held that the defendant's physical similarities with the absconder, coupled with his "immediate" flight upon being approached, supported the officers' reasonable belief that the defendant was the target of their warrant. The defendant subsequently pleaded guilty to a single count of attempted criminal possession of a weapon in the second degree.
The Appellate Division, Fourth Department, with two justices dissenting, affirmed Supreme Court's suppression order (see 236 AD3d 1410 [4th Dept 2025]). The majority rejected the defendant's argument that the encounter should have been evaluated under the framework developed in People v De Bour (40 NY2d 210 [1976]), instead applying the test set forth in Hill (236 AD3d at 1411). As to the first element of the Hill test, whether the officer has probable cause to make an arrest, the majority observed that there was no dispute that the officers possessed a valid arrest warrant; as to the second element, the majority "conclude[d] that under the totality of the circumstances . . . the arresting officer's testimony establishe[d] [*2]that he reasonably believed that defendant was the absconder" (id. at 1412). The defendant "closely matched the height and weight provided in the parole absconder's description, covered his face with a ski mask, was in the location provided by the absconder's girlfriend, and immediately fled upon being approached by one of the [ ] team's unmarked vehicles" (id.).
The dissenting justices agreed that Hill's reasonable belief test applied but would have held that it was not satisfied. According to the dissent, the People established only that the defendant "matched the generic height and weight of the average male in the general population" (id. at 1413 [Ogden and Nowak, JJ., dissenting]). Notably, "the pursuing officers could not see defendant's face or even discern defendant's race given that they were 20 to 30 yards away from defendant who was, reasonably, wearing a ski mask on a cold December day" (id. at 1415 [Ogden and Nowak, JJ., dissenting]. Moreover, the People did not "call the approaching officers, and thus adduced no testimony with respect to their actions, observations, or whether they believed—reasonably or not—that defendant was the parole absconder" (id. at 1413-1414 [Ogden and Nowak, JJ., dissenting]).
A dissenting justice granted the defendant leave to appeal.II.
The defendant and the People disagree about whether we should evaluate the investigators' pursuit and arrest under De Bour or Hill. The People also argue that defendant's argument about the applicability of De Bour is unpreserved for our review. Both the People and the defendant cited De Bour cases in their motion papers before the suppression court; it was that court which first relied on the Hill rule. Because the defendant makes essentially the same argument before us that he made before the court of first instance—that De Bour should control—it is preserved for our review (see CPL 470.35 [1]).
The De Bour framework lays out four escalating "levels" of law enforcement intrusion and the degree of suspicion necessary to justify each of them. At the first level, police may engage in minimally intrusive questioning "when there is some objective credible reason for that interference not necessarily indicative of criminality" (De Bour, 40 NY2d at 223). The second level "permits a somewhat greater intrusion . . . to the extent necessary to gain explanatory information" and requires "a founded suspicion that criminal activity is afoot" (id.). Once an officer "entertains a reasonable suspicion that a particular person has committed, is committing or is about to commit a felony or misdemeanor," they may stop and detain that person (id.). Finally, at level four, an officer may arrest a person if they have probable cause to believe that a crime has been committed (see id.). Here, the parole investigators pursued the defendant, which the parties agree requires reasonable suspicion (see People v Cleveland, 44 NY3d 8, 11 [2025] ["Pursuit of a fleeing suspect constitutes a level three detention"]).Hill addresses the validity of a "mistaken arrest"—that is, when the police have probable cause to arrest a person (typically, an arrest warrant), and reasonably but mistakenly believe the person arrested is the person they are seeking (see 401 US at 802-804; United States v Glover, 725 F2d 120, 122 [DC Cir 1984] ["The arrest of a person who is mistakenly thought to be someone else is valid if the arrest officer (a) has probable cause to arrest the person sought, and (b) reasonably believed the person arrested was the person sought"], cert denied 466 US 905 [1984], citing Hill, 401 US at 802). Each Department of the Appellate Division has embraced this rule in the context of a mistaken arrest (see e.g. People v Porter, 109 AD3d 737, 737 [1st Dept 2013]; People v Fabian, 126 AD2d 664, 665 [2d Dept 1987]; People v Tejada, 270 AD2d 655, 657 [3d Dept 2000]; People v Dortch, 186 AD3d 1114, 1115 [4th Dept 2020]), though none appear to have contemplated the circumstances present here—namely, an arrest predicated on something that happens in the course of a pursuit and not on a warrant.
We need not decide which of the tests should control, because in this scenario we do not perceive a meaningful difference between Hill's requirement of a reasonable mistaken belief and De Bour's level three [*3]standard of reasonable suspicion [FN2]. Indeed, during argument defense counsel effectively conceded as much. Under Hill, the arresting officer must provide "reasonable, articulable grounds to believe that the suspect is the intended arrestee" (Sanders v United States, 339 A2d 373, 379 [DC App 1975]; see also State v Lee, 97 Wis 2d 679, 681, 294 NW2d 547, 549 [1980]). By the same token, our De Bour caselaw specifies that reasonable suspicion requires an officer to point to "specific and articulable facts which, along with any logical deductions, reasonably prompted th[e] intrusion" (People v Brannon, 16 NY3d 596, 602 [2011], quoting People v Cantor, 36 NY2d 106, 113 [1975]). Thus, when it comes to evaluating this particular scenario, the tests essentially ask the same question: whether the totality of the circumstances, including the defendant's appearance and any additional observations about their behavior, justifies the resulting police-citizen encounter. Decisions from other state high courts applying Hill have suggested a similar convergence when a mistaken arrest occurs in the context of a street encounter (see State v Smith, 102 Wash 2d 449, 453, 688 P2d 146, 149 [1984] [applying Hill but observing that "(i)n the context of this case, 'probable cause' means cause to believe that (the defendant) was the (person) named in the warrant"]; State v Sanders, 339 NW2d 557, 560 [Minn 1983] [citing the Hill rule but holding that the initial stop to ascertain the defendant's identity had to be justified by reasonable suspicion]).III.
Whether framed in terms of reasonable suspicion of criminal activity or reasonable mistaken belief that the defendant was the target of an arrest warrant, the record here does not justify the pursuit and subsequent arrest of the defendant. Two reasons yield this conclusion. First, the pursuing investigators' testimony does not reveal a sufficiently close match between the defendant's appearance and the identifying details they were given about the parole absconder. Second, the defendant's flight from the investigators, on which the Appellate Division majority relied, cannot support an inference that he was the target of the warrant because the record is devoid of any suggestion that he could have known he was fleeing from law enforcement.A.
The pursuing investigators' testimony establishes only that the defendant matched the absconder's description in a broad, generic sense, which is to say that he barely matched the description at all. From a distance of 20 to 30 yards away, the investigators saw a male walking from the direction of the city block that the absconder's girlfriend had identified. He was around 5' 11", weighed 185 to 200 pounds, and was wearing a black ski mask. The investigators could not identify the defendant's race or say whether he resembled the photo that they were provided. The concern is not whether the defendant's description was "reasonably close" to that of the absconder (see dissenting op at 6), but rather that those concrete details, which establish only his general build, would fit any number of people. As the dissenting justices below observed, all this testimony demonstrates is that the pursuing investigators saw, from some distance, a man of average height and build flee upon being approached by another member of their team.
A review of De Bour cases indicates that a match in such broad terms does not permit the conduct here. The Appellate Division has typically required an officer, acting on a suspect's description, to point to more specific identifying features to demonstrate the reasonable suspicion necessary to justify a level three stop (see e.g. People v Johnson, 22 AD3d 371, 372 [1st Dept 2005] [officers showed a "sufficiently specific" match of "clothing and physical characteristics"]; People v Medina, 66 AD3d 555, 556 [1st Dept [*4]2009] [surveillance photos showing a "striking strong resemblance to th(e) defendant" supplied reasonable suspicion for a stop]). Likewise, numerous cases hold that although a match to a general description, even one more specific than that at issue here, may support level one or two encounters, such level of detail cannot, without more, justify more serious intrusions (see e.g. People v Greenidge, 241 AD2d 395, 395 [1st Dept 1997] [holding that a match in "general description" could "provide( ) the police with" cause for a level two encounter]; People v Abdul-Mateen, 126 AD3d 986, 987-988 [2d Dept 2015] [match in clothing, gender, and race could warrant a level two encounter]; People v Smith, 240 AD3d 1218, 1220 [4th Dept 2025] [same]; People v Howard, 129 AD3d 1654, 1654-1655 [4th Dept 2015] [generic description of black males carrying bags supplied the basis for a level one encounter]).
Cases from the Appellate Division and other courts applying Hill likewise require a significantly greater degree of corroboration between the mistaken arrestee and the subject of the warrant to find the requisite reasonable belief. For example, the two individuals share the same name (see e.g. Tejada, 270 AD2d at 657; Sanders, 339 AD2d at 373; State v Bateman, 323 Mont 280, 281 99 P3d 656, 658 [2004]; United States v McEachern, 675 F2d 618, 620-621 [4th Cir 1982]), the mistaken arrestee is found in a specific locale that the target is known to frequent (see Hill, 401 US at 803; Porter, 109 AD3d at 737), or, at a minimum, there is testimony from the arresting officer that provides a good deal more specificity about identifying features apart from a suspect's generic build (see e.g. Fabian, 126 AD2d at 664-665 [arrestee was the brother of the wanted individual and a comparison of photographs "reveal(ed) a reasonable likeness between the two"]; Dortch, 186 AD3d at 1114-1115 [arrestee mistaken for his brother by officers who testified they look alike]). Indeed, a number of cases find arrests invalid despite stronger corroboration of identity than we have here (see e.g. Smith, 102 Wash 2d at 454, 688 P2d at 149), and caution that an arrest cannot be justified in reliance on a description "so general that it fits a very large group" of people (Lee, 97 Wis 2d at 685, 294 NW2d at 550-551; see also State v Frazier, 318 NW2d 42, 43-44 [Minn 1982]).B.
The Appellate Division majority further relied on the defendant's flight upon being approached, but we do not find this a sufficient ground to support the pursuit and arrest, either alone or in combination with the general match in description. For a suspect's flight to reasonably inform the officers' suspicion of criminal activity, there must be, at a minimum, some indication that the suspect knew they were fleeing from the police. After all, "an individual has the right to be let alone and refuse to respond to police inquiry" (Cleveland, 44 NY3d at 12, quoting People v Holmes, 81 NY2d 1056, 1058 [1993]). Accordingly, we have underscored that a finding of reasonable suspicion "may not rest on equivocal or 'innocuous behavior' that is susceptible of an innocent as well as a culpable interpretation" (Brannon, 16 NY3d at 602, quoting People v Carrasquillo, 54 NY2d 248, 252 [1981])[FN3]. When it comes to the probative value of a suspect's flight, federal cases take a similar view (see e.g. United States v Castle, 825 F3d 625, 629 [DC Cir 2016] ["(I)n the context of a reasonable suspicion analysis, furtive gestures" like flight "are significant only if they were undertaken in response to police presence" (internal quotation marks omitted)]; Illinois v Wardlow, 528 US 119, 121, 125 [2000] [flight supported inference of criminal activity when officers "were working (in) uniform( )" as part of a police "caravan"]).
Nothing in the record here demonstrates that the defendant could have known that he was fleeing from law enforcement. The pursuing investigators were in an unmarked car and at least one was wearing a hoodie, jeans, and a vest; the attire of the partner is not described. The record does not indicate that any of the investigators—either the one that first approached the defendant, or the ones that chased him—ever identified themselves as law enforcement; perhaps this would be a different case if the record included such evidence. But because the approaching investigator did not testify, we do not know whether that officer thought the defendant was the target of the search warrant; if they exchanged any words at all, let alone what they might have been or whether they might have identified the officer as law enforcement; or why, if the officer reasonably believed the defendant was the target of the warrant, he did not pursue him himself. The only hint in the record that there was any sort of substantive interaction with the defendant prior to his flight was a question by the prosecutor, in which he asked the investigator "how far away" he was from the defendant "when someone from parole was speaking with him." The investigator only responded, "Twenty yards." Absent any affirmative testimony as to what, if anything, was said to the defendant, we find this too slender a reed to support the proposition that the investigator and his partner reasonably understood the defendant to have identified the approaching investigator as law enforcement and fled as a result.
The Appellate Division majority cites two additional points, neither of which we find sufficient. First, the majority noted that the defendant was found in the general area indicated by the absconder's girlfriend. But this point does not carry much weight: nearly an hour had elapsed, and the tip was just that he "may" be found in the general vicinity of a certain city block. Such a general description does not permit an inference, without more, that an individual encountered on a public street was the person sought. The majority also remarked that the defendant was wearing a ski mask, but the testimony established that the investigators did not find that unusual, given the cold weather conditions. None of these factors, alone or in combination, were sufficient to justify the pursuit of the defendant.
* * *
Just as New Yorkers have the right to be free from unreasonable governmental intrusion, law enforcement must also be able to execute warrants effectively and efficiently, and neither article I, § 12 of our Constitution nor the Fourth Amendment require certainty before they do so. But a warrant authorizes arrest only for the person named in the warrant, not for any person the officers may encounter who bears some passing resemblance to the suspect. Here, the record is simply insufficient to establish that the parole investigators did enough to corroborate identity before engaging in the pursuit of the defendant.
Accordingly, the order of the Appellate Division should be reversed, the defendant's suppression motion granted, and the indictment dismissed.

CANNATARO, J. (dissenting):

I agree with the courts below that the test developed by the U.S. Supreme Court in Hill v California (401 US 797 [1971]) should be applied to cases of mistaken identification of suspects by law enforcement, such as the one presented here. Applying that test, I conclude that there was record support for the lower courts' finding that the parole officers' belief that they had correctly identified the person they were looking for was reasonable under the circumstances. For these reasons, I respectfully dissent.I.
On December 20, 2017, plainclothes parole officers were searching for a parole absconder in Rochester pursuant to an active arrest warrant. According to the Arrest and Booking Data information sheet they had on hand, the officers knew the absconder was 6'1" and weighed 180 pounds; they also knew his race, skin tone, age, and other personally identifying information such as his home address. The officers also had a photograph of the absconder. As part of their effort to locate the absconder, the officers spoke to his girlfriend, who told them that he might be found on the 100 block of Flanders Street.
Around 45 minutes later, officers arrived at the location where they noticed an individual, the defendant in this case, walking towards them wearing a ski mask. The individual officers observed appeared to be approximately 5'11" tall and weigh between 185 and 200 pounds. As the officers approached, defendant ran away, and the officers gave chase. While fleeing, defendant was seen tossing a handgun away, which was recovered at the scene. The officers also recovered a second handgun found on the path defendant took as he fled. After catching up and apprehending defendant, the officers searched him and found six vials containing a white rock substance on his person. Defendant was arrested and charged with two counts of criminal possession of a weapon in the second degree (Penal Law § 265.03 [3]) and one count of criminal possession of a controlled substance in the seventh degree (§ 220.03).
Defendant moved to suppress evidence of the possession of the weapons and drugs as the fruit of a purportedly unlawful seizure. Both Supreme Court and the Appellate Division found that the seizure was not unlawful because, under the rule of Hill, officers had a mistaken but reasonable belief that defendant was the subject of the arrest warrant when they initiated pursuit.II.
The majority declines to decide whether Hill or People v De Bour (40 NY2d 210 [1976]) governs here because it "do[es] not perceive a meaningful difference between Hill's requirement of a reasonable mistaken belief and De Bour's level three standard of reasonable suspicion" (majority op at 7). In my view, the difference between these standards turns on the underlying "mistaken belief" or "suspicion" being tested for reasonableness and the purposes of those determinations.De Bour regulates police-initiated investigatory street encounters by mandating that law enforcement adduce increasing evidence of criminality to justify increasing levels of inquiry and seizure (see 40 NY2d at 223; People v Hollman, 79 NY2d 181, 185 [1992]). Specifically, De Bour level three asks whether police have adduced enough evidence to form "a reasonable suspicion that a particular person has committed, is committing or is about to commit a felony or misdemeanor," so as to justify the temporary detention of that person (see De Bour, 40 NY2d at 223).
None of these inquiries are relevant when there is a warrant. A warrant is a written determination establishing probable cause to arrest the identified subject. As relevant here, by virtue of agreeing to the terms of parole, a parolee justifies the issuance of a warrant against them when they abscond from court, their parole appointments, or other parole obligations. No further investigation is necessary to establish probable cause that parole was violated, nor that the subject themselves violated parole. The only task remaining for law enforcement is to find the subject so they can execute the warrant. Insofar as any additional investigation occurs, it is directed at establishing the subject's whereabouts (see People v Ebron, 275 AD2d 490, 491 [3d Dept 2000] [holding De Bour inapplicable when "the arresting officer approached defendant to execute a concededly valid arrest warrant" after searching for and finding him during patrol]). [*5]Because probable cause to arrest had already been established here, the intricacies of graduated De Bour analysis of observed criminality are simply not relevant.Hill, on the other hand, squarely addresses arrests pursuant to a warrant. It requires not only that police show that they already possessed probable cause to arrest the intended target, but that they were also possessed of a reasonable belief that the person detained was the person sought (401 US at 802). This standard recognizes that the remaining inquiry is purely one of identity, and not of suspicion of criminality. So long as the belief that they had the right person was reasonable, all levels of inquiry, detention, or arrest up to and including probable cause would have been permissible.
The analytical framework of Hill is also eminently compatible with state constitutional protections. Indeed, this Court has already adopted a reasonable mistake rule in a similar circumstance. In People v Guthrie, this Court held that a reasonable mistake of law did not invalidate a traffic stop that was otherwise based on probable cause that the driver committed the prohibited action (25 NY3d 130 [2015]). In reaching this decision, we relied on the U.S. Supreme Court's ruling in Heien v North Carolina from the year before, which held that seizures based on mistakes of law are constitutional so long as the requisite showing is otherwise met (see 574 US 54 [2014]). For its part, the Supreme Court expressly relied on Hill to support its holding in Heien (see id. at 61 ["We have recognized that searches and seizures based on mistakes of fact can be reasonable . . . (b)ut reasonable (people) make mistakes of law, too"], citing Hill, 401 US at 802-05, and Brinegar v United States, 338 US 160, 176 [1949]). In Guthrie we also concluded that "'[n]one of the reasons for extending [the] protections of our Constitution beyond those given by the Federal Constitution'" applied in such circumstances (25 NY3d at 137, quoting People v Robinson, 97 NY2d 341, 351 [2001]), in part because we found that Heien was a continuation of longstanding federal precedent "'dating back two centuries [that] support treating legal and factual errors alike in this context'" (id., quoting Heien, 574 US at 62 [emphasis added]). The mistake of law rule in Guthrie and Heien was explicitly justified as an extension of the comparatively more settled mistake of fact doctrine from Hill. If an officer's reasonable mistake of law can be excused even when performing an investigatory stop (including, presumably, a De Bour street encounter), then it should follow that a reasonable mistake of fact would excuse a seizure effectuated pursuant to a valid warrant.III.
Whether it was reasonable for officers to believe that defendant was the subject of the warrant presents a mixed question of law and fact. This Court may only review such determinations for a lack of record support (see People v Brown, 25 NY3d 973, 975-976 [2015]; People v Vandover, 20 NY3d 235, 237-239 [2012]). Under this highly deferential standard, I would conclude that there was support in the record to find that the officers had a reasonable mistaken belief that defendant was the subject of the warrant.
In addition to the warrant itself, the parole officers had a picture of the subject and knew his height and weight (6' 1", 180 lbs.), as well as his race and skin tone. According to officer testimony, they also interviewed the subject's girlfriend in person, who told the officers that defendant may be at the 100 block of Flanders Street in Rochester. The officers arrived at the scene around 45 minutes later when they happened upon defendant walking towards them down that block.
While I agree with the majority that the record is not as complete as it could be, there is support for the finding that officers reasonably believed defendant was the absconder based on the facts the officers adduced before the approach. An observed height and weight of 5'11" and 185-200 pounds is reasonably close to the 6'1" and 180 pounds recorded on the data sheet—well within the bounds of what might lead a reasonable person to believe that the individual observed matched the description given without the benefit of physically weighing or measuring him on the spot.
Defendant was also approached on the block the absconder's girlfriend said he would be on. Again, the majority's various arguments against the usefulness of this information veer into relitigating the lower courts' assessment of the evidence. One block of a specific street in a residential neighborhood—especially outside, and in the apparent cold—is as narrow a locale to search as any individual address. This block was [*6]also within a few minutes' walking distance of the target's home address, so it was not unreasonable to believe that he might be there. A tip that someone "may" be at a location is also sufficiently actionable to go to the location to see if someone matching the parolee's description is there. There was also no indication that the girlfriend said the parolee might only be there for some limited amount of time, and there is no record support to conclude that the usefulness of the tip somehow expired after 45 minutes. There was likewise no evidence indicating that the girlfriend was lying, and there is certainly no requirement that information from a girlfriend about her boyfriend's whereabouts is inherently unreliable.
To be clear, the officers would not have been justified in stopping everyone of the same general height and weight throughout the City, or even throughout the specified neighborhood. Nor would it have been permissible to seize anyone who happened to walk through that block. And admittedly in most circumstances parole officers would benefit from seeing the person's face, which would eliminate the vast majority of false positives. But even with these limitations, it remains possible to conclude on this record that the police were reasonable in their belief that a person of roughly the height and weight they were expecting to find was in fact found on the residential block his girlfriend said he would be, on the day he was said to be there.
Moreover, even if we were to apply a graduated De Bour analysis here, the record supports a finding that officers had reasonable suspicion to pursue defendant. While possessing all the information described above that led the investigators to believe defendant was the absconder, one of the officers saw defendant talking to fellow officers, and then saw defendant immediately take flight. At that point, the officer had reasonable suspicion to believe defendant was the absconder, and the officer could pursue him (see People v Sierra, 83 NY2d 928, 930 [1994]). Once that pursuit was justified, the arrest was lawful based on the officer's observation of the gun in defendant's hand (see People v Matienzo, 81 NY2d 778, 780 [1993] ["In the circumstances presented, defendant's flight furnished reasonable suspicion that he had committed or was about to commit a crime such that pursuit by the officers was justified. Defendant's abandonment of the bag (containing narcotics) therefore was not in response to unlawful police conduct" and that evidence supplied the necessary probable cause to arrest] [internal citations omitted]). Accordingly, even if the officers did not have probable cause to arrest the defendant when they first approached him or reasonable suspicion to detain him (and they did neither of these things at that point), they had the requisite reasonable suspicion to justify pursuit when defendant fled (see People v Martinez, 80 NY2d 444, 447 [1992] [pursuing someone "for the purpose of detaining them . . . results in a lesser interference with freedom than does an arrest (and) we have held that the police may . . . pursue an individual if they have information which, although not yielding the probable cause necessary to justify an arrest, provides them with a reasonable suspicion that a crime has been, is being, or is about to be committed"]).
In sum, the record supports the affirmed finding that pursuit of defendant was not unconstitutional, and the order should be affirmed. For these reasons, I respectfully dissent.
Order reversed, defendant's motion to suppress granted and indictment dismissed. Opinion by Judge Halligan. Chief Judge Wilson and Judges Rivera and Troutman concur. Judge Cannataro dissents and votes to affirm in an opinion, in which Judges Garcia and Singas concur.
Decided March 17, 2026

Footnotes

Footnote 1: The parole absconder's wanted sheet indicated that his last known address was on Raeburn Street in Rochester. Although there is no Raeburn Street in Rochester, Raeburn Avenue is across the street from the city block provided by the girlfriend.

Footnote 2: Our dissenting colleagues do not state a contrary position. Instead, they assert that "the intricacies of graduated De Bour analysis of observed criminality are simply not relevant" here, given that "probable cause to arrest ha[s] already been established" (dissenting op at 4). True, a valid arrest warrant establishes probable cause to arrest, but the arresting officers must confirm not just the suspect's whereabouts (see dissenting op at 4), but also whether an individual they encounter is in fact the suspect.

Footnote 3: The De Bour cases cited by our dissenting colleagues (see dissenting op at 7-8) do not compel a different result. In each, the officers appear to have been in uniform or were otherwise easily identifiable as law enforcement (see People v Sierra, 83 NY2d 928, 930 [1994] [relying on defendant's "refusal to approach" a police "cruiser"]; People v Matienzo, 81 NY2d 778, 779 [1993] [officers in "a patrol car" followed the defendant and ordered him to stop]; People v Martinez, 80 NY2d 444, 446 [1992] [although officers were "dressed in plain clothes," one "had his identifying badge prominently displayed and defendant knew him to be a police officer" due to a prior interaction]). Additionally, we have emphasized that flight must be "combined with other specific circumstances indicating the suspect may be engaged in criminal activity" (Holmes, 81 NY2d at 1058; see also Sierra, 83 NY2d at 929 [same]). Each of the cited cases, in contrast to this one, includes such details.